### Wellington Cross v. Estate of Osro H. Patch

[178 A.2d 393]

September Term, 1961

Present: Hulburd, C. J., Holden, Shangraw, Barney and Smith, JJ.

Opinion Filed November 7, 1961

Reargument Denied March 7, 1962

*Finn & Davis* for the plaintiff.

*Alfred A. Guarino* and *Black & Plante* (*Raffaele Terino* on the brief) for the defendant.

**Hulburd, C. J.** In April 1955, at about 8:00 P.M., the plaintiff was injured when the 1949 Dodge automobile in which he was riding as a passenger collided successively with two guardrail posts and a cement bridge abutment. The defendant's intestate was the owner and operator of the automobile at the time of the accident. He died suddenly five days later at the Rutland Hospital as a result of it. The plaintiff has brought his action against the defendant estate pursuant to 23 V.S.A. §1491 to recover the damages arising from the injuries he sustained in the accident.

On the evening in question, the plaintiff and his host were proceeding in a generally westerly direction toward Rutland on U. S. Route #4 near the town of Sherburne. This is a macadam-surfaced highway with a painted white center line. There was no ice or snow on the road. The weather was fair. Mr. Patch's automobile was in good condition with properly functioning lights and brakes. The tires on his automobile were "in very good shape." Mr. Patch was very familiar with the road and had travelled over it many times a year for several years prior to the accident. He was a man sixty-two years of age, in good general health, who wore glasses only when reading.

Photographs, introduced in evidence, show the highway leading to the bridge where the accident occurred. They disclose the manner in which the road takes a curve to the left as one approaches the bridge in the direction in which Patch was travelling. Surveys introduced in evidence, prepared by an engineer, furnish the precise mathematical details in this regard. The width of the road in the area of the accident was 16 feet. The degree of curvature of the curve situated just easterly of the bridge where the accident occurred is 18° 53′ in a distance of 100 feet. The sub-elevation or banking of the curve is also shown on the surveys. Sub-elevation is the difference in elevation from the low side of the curve to the high side of the curve. For a vehicle proceeding in the direction in which the Patch vehicle was operating, the high side of the curve is to the right of the operator and the low side to his left. The difference from the low side of the curve to the high side of the curve in the area of the accident was 20 inches.

It was explained by the engineer testifying that the degree of curvature and the amount of sub-elevation, or banking, determines the speed at which a vehicle may safely travel around the curve without being affected by centrifugal force. Ordinarily, when a vehicle is passing around the curve, the centripetal force (arising from certain specified factors) tends to balance the centrifugal force. He went on to give his opinion that as a matter of established physical law, it would not be possible for a vehicle proceeding as the Patch vehicle was proceeding around the curve in question to do so at a speed greater than thirty-four miles per hour without being seriously affected by centrifugal force and being pulled off to the right side of the road. This fact was corroborated by the testimony of a second highway engineer. Both the engineers testified that there may be other

variables which could enter into the formula upon which they based their opinions, such as the weight of the particular vehicle, its width, that is the distance between its wheels, the method of steering, and "the human factor." But using "average conditions, average drivers, average roadways, vehicles, surfaces and the like," they testified that based on this formula and the measurements shown by the survey it was their opinion that the curve in question was designed for a maximum speed of thirty-four miles an hour.

The physical evidence tended to show that as the vehicle was being operated in a westerly direction along Route #4, and approaching the bridge, it was driven off the right-hand side of the road and continued off the road in a westerly direction a distance of about 100 feet, first colliding with two wooden guard posts, and then striking its right front with the bridge abutment on the right side of the bridge.

The violence of the impact was such that the plaintiff, who was riding in the front seat at the driver's right, was pinned by the frontboard which had been forced back against him. This in turn was due to the fact that in the collision the engine in the car had been pushed back into the frontboard and the front part of the car. The plaintiff was still unextricated from his position in the automobile when state police officer Jenne arrived on the scene about a quarter of an hour later. He testified that at this time, the driver, Mr. Patch, was standing in the road near his automobile. The officer questioned him about the accident. Mr. Patch told him that he didn't know how the accident happened and that he thought he was travelling about 40 miles an hour when the collision occurred. He also stated that his lights were all right, but aside from this much, officer Jenne testified, "I couldn't get any information from him as to the cause of the accident, and he refused any medical attention for his injuries,—refused to go to the hospital and was very uncooperative. There was a strong smell of liquor on his breath and he appeared to be dazed."

In his investigation, Officer Jenne stated that he recalled a rut or wheel track approximately six to twelve inches off the paved surface of the highway, on the right hand side of the road as the car was travelling, extending back easterly from the wrecked vehicle 75 or 100 feet. He did not photograph or take any measurement of these marks. The only photograph taken at the scene was of the automobile itself. This photograph did not show the highway over which the auto had

just come before it came to rest. Other photographs in evidence supplying this information were taken at a much later date.

We come now to the plaintiff's first assignment of error. One of the witnesses for the plaintiff was Andrew Monti. He testified that he was a lieutenant in the Vermont State Police and had been a member of that force ever since its inception in 1949; that prior to that time he had been employed by the state motor vehicle department so that his total employment with the two organizations amounted to seventeen years; that for the past five years his duties have been as Superintendent of Identification and Records, Training and Public Information of the State Police; that it is a part of his duties to review accident reports and compile statistical data; that for approximately ten years prior to his present position he had investigated automobile accidents, and that even after he started to act in his present capacity, he continued to make some investigations; that altogether he had examined about twenty thousand accident reports and that he had investigated personally between three and four thousand accidents; that he had examined from six to seven thousand photographs of accidents; that of the accidents which he had personally investigated, about one thousand to fifteen hundred, were one-car accidents, in which the vehicle was in collision with an immovable object; that about fifteen hundred to eighteen hundred of the cases handled by him statistically were cases involving a vehicle with an immovable object; that in this connection he had compared the reported speed of the vehicle involved with the extent of the damage which had occurred; that he has made studies as to the relationship of injuries and damage resulting from automobiles striking immovable objects, in association with studies that are being conducted by the Cornell University research in the field of automobile collisions; that in general he had assimilated and compared the data obtained by him with reference to cases involving a collision of an automobile with an immovable object with special regard as to damage as related to speed. As pertains to this particular case the witness then testified that he had gone to Sherburne to view the accident scene and had taken pictures of it; that he had examined the automobile in a junk yard where it had been taken after the accident and observed its condition; that he found its condition to be accurately represented by the photographs of it which had been put in evidence. With the groundwork being

laid as we have stated, the witness was then asked by the attorney for the plaintiff whether or not he had an opinion "with regard to the speed at which the car shown in Plaintiff's #13 was travelling when it was in collision" to which he replied, "yes." Upon being asked to state that opinion the attorney for the defendant objected upon the ground that "it is incompetent," saying "our Supreme Court has spoken to some extent on this subject and has stated, for instance, that the extent of the injuries or damage to an automobile is no indication at all as to the speed of the car at the time it came into collision with an object." Further discussion followed between court and counsel, and, during it, counsel for the defendant added another ground of objection,—that the evidence if admitted would constitute "one of the ultimate facts for the jury, and that being so, he (the witness) is not permitted to express an opinion even though he might be competent." Thereupon, the plaintiff offered to show that, if the witness were permitted to testify, he would state that the automobile was travelling between forty-five and fifty-five miles an hour. The court sustained the defendant's objection "on the competency of the witness to determine speed in accordance with the opinion he is requested to give."

■ Whatever may have been argued before the court below, counsel are now in agreement that we have no decided cases in this state directly in point on the question presented here. Perhaps the first thing we should say on this subject is this: had the trial court permitted the witness to state his opinion as requested, we would have had no difficulty in sustaining its action. There can be no doubt that a properly qualified expert may give his opinion as to the rate of speed an automobile is traveling in given circumstances when an adequate factual basis exists for such opinion. *Freeman* v. *Scahill,* 92 N. H. 471, 32 A.2d 817, 818; *Cobb* v. *Coleman,* 94 Ga. App. 86, 93 S.E.2d 801, 804; *Clark* v. *Hiatt,* 105 Ohio App. 402, 152 N.E.2d 701, 705; *Johnson* v. *Huskey,* 186 Kan. 282, 350 P.2d 14; *White* v. *Zutell,* 263 F.2d 613; *Zepeda* v. *Moore,* Tex. Civ. App., 153 S.W.2d 212, 214; and see *Reardon* v. *Marston,* 310 Mass. 461, 38 N.E.2d 644, 647; *Wood* v. *Exell,* Mo., 342 S.W.2d 503. Of course, the witness must be properly qualified. Thus an automobile dealer, who had had the limited experience of having examined cars which had been involved in several accidents, was properly held to be not competent to testify. *Oyster* v. *Dye,* 7 Wash.2d 674, 110 P.2d 863, 133 A.L.R. 720.

■ Our chief difficulty in this case arises from the fact that the trial court has rejected the evidence on the ground of competency. The facts that Lieutenant Monti testified to about himself were not contested. Indeed, the defendant made no attempt even to cross-examine him. The question of competency is always a preliminary one for the trial court to determine in its sound discretion. Such a ruling and finding is not revisable here unless it appears from the evidence to be erroneous or founded upon an error of law. *Smith* v. *DeMetre,* 119 Vt. 73, 81, 118 A.2d 346, 58 A.L.R.2d 1. Can we say, as a matter of law, that the evidence before the court below as to the special training, skill and experience of Lieutenant Monti was such as constituted him an expert on the subject interrogated about? This must be the test here. Our pertinent rule is laid down in *Wright* v. *Williams,* 47 Vt. 222, 233. Paraphrasing the language of the rule there stated: was the trial court correct when it held that what witness Monti testified to as to himself, taken as true, did not constitute him an expert in the matter interrogated about? We think not. If this witness was not qualified, we are at loss to see how any witness could be so regarded by a judge in the position of the court below. We view the evidence as in no way leaving the witness' qualifications open to any reasonable doubt and hence the ruling of the court below is founded on an error of law and cannot stand.

The importance to the plaintiff's case of the evidence excluded may readily be seen. By the exclusion, the plaintiff was deprived of the benefit of testimony tending to show that Patch rounded the curve leading to the bridge at a speed not only which was excessive, but so excessive he must have known he was taking a serious risk of losing control of his vehicle, thereby exposing his guest to an unnecessary danger. Such conduct could be found by the jury to constitute an indifference on the part of the operator to his duty to his guest or an utter disregard of the guest's safety and so amount to gross negligence. A showing by the plaintiff that Patch was merely operating "too fast" would not be enough. Mere negligence afforded the plaintiff no right of action. There must be gross or wilful negligence. It was incumbent on the plaintiff not only to show that Patch was driving excessively fast in the circumstances, but that his conduct in that regard was so aggravated that he knew or must have known of the danger his action created and that he was indifferent to it. The expert testimony

served to furnish a basis for this very inference. It put the speed of the Patch car in a bracket which tended to rule out a determination that the accident occurred because of simple negligence or error in judgment. It should be borne in mind that this is not the case in which an operator, in driving over a strange road, comes unexpectedly upon a sharp bend in the road. The quality of the operator's conduct is to be considered by the jury in the light of this fact.

Because of what we have said, there is no need to dwell on the court's action in granting a directed verdict in favor of the defendant. The defendant has urged that the trial court's action was justified on the ground of contributory negligence or assumption of risk on the part of the plaintiff. As to the matter of contributory negligence we need only say that it is enough to carry the question to the jury to give evidence of such facts and circumstances as to warrant an inference of due care. *Smith* v. *Grove,* 119 Vt. 106, 119 A.2d 880. Of course, where the evidence gives rise to opposing inferences the question remains one for the jury. The trial court would be justified in directing a verdict for the defendant only when the evidence as a matter of law indicates that the plaintiff was guilty of contributory negligence. *Labrecque* v. *American News Co.,* 115 Vt. 305, 307, 58 A.2d 873. This was not the case, nor on the facts we have mentioned was the jury precluded from finding that the plaintiff did not assume the risk of his injury. *Benoit* v. *Marvin,* 120 Vt. 201, 207, 138 A.2d 312.

*Judgment reversed and cause remanded.*

Holden and Smith, JJ. concur in the result.

---

## On Request for Leave to Reargue

**Per Curiam.** After the opinion in this appeal was handed down, the defendant seasonably requested permission to reargue under Supreme Court Rule 22. The motion presented is founded on the defendant's belief that this Court misapprehended and overlooked certain points of law and facts, which, if considered, would change the result.

None of the points presented in the defendant's motion was overlooked or misapprehended when this appeal was first considered.

The petition indicates a misunderstanding on the part of its proponent concerning the internal operating procedure of appellate tribunals. It is suggested that the failure of the majority opinion to achieve the full accord of all members indicates a shortage of consideration and participation on the part of the justices who concurred only in the result. To the contrary—the entry indicates full participation in this, as in all causes, by all members of the Court, but that their consideration has generated disagreement concerning the relative merits of the error assigned rather than dissent as to the final result. Although the Court divided on the relative merits of the several errors claimed by the appellant, there was full agreement that reversible error was committed in the direction of a verdict of no liability, and a new trial must be ordered. The defendant has failed to demonstrate how this result could be changed by reargument.

*Request for permission to reargue is denied.*