No. 88-134

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

_____

KAREN McCAIN,

          Plaintiff and Appellant,

   -vs-

JOHN BATSON, M.D.,

          Defendant and Respondent.

_____

APPEAL FROM:  District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Joseph Gary, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        James J. Screnar; Nash, Guenther, Zimmer & Screnar,
Bozeman, Montana

    For Respondent:

        Richard F. Cebull; Anderson, Brown Law Firm, Billings,
Montana

_____

Submitted on Briefs:  June 30, 1988

Decided: August 18, 1988

Filed:  AUG 1 8 1988

_Ethel M. Harrison_

Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal of summary judgment granted in favor of defendant John Batson, M.D. Plaintiff/appellant Karen McCain (McCain) brought this action in the District Court of the Eighth Judicial District, Gallatin County, Montana, the Honorable Joseph B. Gary presiding. McCain sought to recover damages for the negligent treatment of her injuries by the defendant/respondent, John Batson, M.D. (Dr. Batson). Dr. Batson sought summary judgment by invoking immunity of the Montana Good Samaritan Statute § 27-1-714, MCA. On February 4, 1988 the District Court granted Dr. Batson's motion for summary judgment. McCain now appeals.

McCain and two friends, Sherry Warner (Warner) and Rosemary Checketts, (Checketts) spent a weekend in West Yellowstone, Montana, arriving the morning of September 25, 1982, from Ogden, Utah. They planned to stay with Warner in her condominium. That evening, after preparing and eating supper at home, the three friends decided to go into the town of West Yellowstone. The three decided to walk into town as Warner's truck battery was dead. The condominium was not far from town so they walked to the nearby Stagecoach Inn. After spending some time at the Inn, the women became separated and about 11:00 p.m. McCain decided to return alone to the condominium.

McCain was unfamiliar with the area and while walking back in the dark fell into an eight-foot deep excavation pit. The pit contained rebar set in concrete at six inch intervals. As a result of the fall she severely impaled her upper left leg on a piece of rebar. After extracting herself off the rebar, McCain crawled out of the pit and crawled to a

2

lighted doorway of a nearby condominium. McCain rapped on the door of a condominium occupied by Dr. James Grindley, a Bozeman radiologist, and his wife. Mrs. Grindley answered the knock on the door. After McCain told Mrs. Grindley about her accident and injury, Dr. Grindley went to the Stagecoach Inn to retrieve her two friends. Throughout this time, Dr. Grindley did not mention he was a physician and McCain remained on the patio or lawn outside of the condominium. Dr. Grindley is a radiologist with extensive surgical and emergency room experience. He did not initially examine McCain's injury, and in a deposition Dr. Grindley admitted that he did not have any medical equipment at the condominium.

McCain's friends returned with Dr. Grindley and attempted to assist her. Warner, a surgical assistant had gotten her box of medical supplies and removed McCain's pant-leg with a pair of bandage scissors. At that time Dr. Grindley informed them that he was a physician. Dr. Grindley examined the wound and advised all present that while technically he could repair the wound, he had no desire to do so without being able to "debride it and clean it."

At deposition Dr. Grindley testified he then offered to drive McCain and her friends to the nearest hospital in Ashton, Idaho. They refused his offer and informed Dr. Grindley that they believed there was a doctor staying in town who could help them and that if they needed Dr. Grindley's services later, they would contact him.

Dr. Grindley further testified that at that time the wound may have "been bleeding a tiny bit . . . and that her panty hose seemed to be holding the tissues all in good position so that it was minimizing any bleeding." McCain

testified that at that time she had little pain and the leg was "dead, numb, dead." After taking McCain back to Warner's condominium, and some three hours after the accident, Warner was able to locate where defendant/respondent Dr. Batson was staying. Dr. Batson got up out of bed, left the condominium where he was staying and agreed to come to the Warner condominium to see what could be done. Dr. Batson testified that McCain was lying on a couch and that when he examined the wound he could see considerable dirt and mud in the wound. With the help of Warner and her surgical kit which contained instruments, suture, IV solutions, and other items that could be used to clean the wound, Dr. Batson debrided the wound as best he could. He then loosely sutured the wound and dressed it with bandages from the medical kit. All of this was done under the light of a lamp in the Warner condominium

Dr. Grindley testified at deposition that he informed all three women soon after the accident that the wound had to be treated at a hospital and under a general anesthesia and that the wound needed to be treated surgically. Dr. Batson's evaluation of the injury mirrored Dr. Grindley's that this was not an emergency situation but that McCain should go to a hospital as soon as possible. Dr. Batson informed the women that he would call the hospital in Ashton, Idaho and order pain and antibiotic medication and a tetanus shot to be available to McCain the next morning.

It should be noted that the reason McCain did not immediately go to a hospital was that the ambulance at West Yellowstone was not available as it had taken someone to Bozeman, Montana, just before she was injured and would not return until the next morning. As previously noted, the

4

truck used by the parties to travel to West Yellowstone had a dead battery but would be repaired by the next morning. As the hour was very late, the three spent the rest of the night at the Warner condominium and planned on returning to Ogden later that morning/early afternoon via Ashton, Idaho.

Dr. Batson testified that later that morning about 11:00 a.m., he returned to check on the three women. He found them still packing and preparing to return to Ogden. Dr. Batson said he advised them again that his suturing of the wound was a first-aid type procedure and it was necessary that they go to a hospital and have the wound properly treated.

According to the deposition of Checketts, they did stop at the Ashton, Idaho hospital where they got some pain medication and antibiotics which served as treatment until McCain returned to Ogden. They then drove on into Ogden arriving at approximately 7:00 p.m. and took McCain to her apartment where it was their understanding that McCain would go to the hospital and see a doctor the next morning. However, McCain did not go to the hospital or see a doctor until about one week later. By this time her wound had become infected and required considerable surgery and medical treatment.

On September 25, 1985, three years to the date of the injury, Dr. Batson was sued by McCain for suturing the wound without adequate debriding, or cleansing of the contaminated wound and for failing to inform anyone that the procedures that he followed were not final procedures. In other words, McCain claims he failed to inform her that the wound would have to be opened up, recleansed, debrided, and resutered.

5

McCain alleges that this is a case of malpractice which has caused her serious injury.

This case was presented to the District Court on depositions of Sherry Clarey Warner, Karen McCain (plaintiff and appellant), Rosemary Checketts, Dr. Wesley G. Harline, Dr. Lee J. Malan (a surgeon who later operated on her at Ogden, Utah), Dr. John Batson (defendant and respondent), and Dr. James S. Grindley (the radiologist who first saw the injured McCane at his door). Based on the information contained in the depositions, the District Court granted Dr. Batson's motion for summary judgment. Attached to said summary judgment was a memorandum of Judge Joseph Gary concerning the reasons for his granting of summary judgment.

Several questions are presented for our consideration:

1. Did the District Court improperly find that the provisions of the Montana Good Samaritan Statute, § 27-1-714, MCA, were applicable to an instance where the negligent care rendered was remote in time and location to the scene of the accident or emergency, and was otherwise without the purpose of the act?

2. Did the District Court improperly usurp the function of the jury by resolving questions of fact in its grant of summary judgment?

The first issue concerns the Montana Good Samaritan Statute, § 27-1-714, MCA, which reads:

> (1) Any person licensed as a physician and surgeon under the laws of the state of Montana, any volunteer firefighter or officer of any nonprofit volunteer fire company, or any other person who in good faith renders emergency care or assistance without compensation except as provided in subsection (2) at the scene of an emergency or accident is not

6

liable for any civil damages for acts or omissions other than damages occasioned by gross negligence or by willful or wanton acts or omissions by such person in rendering such emergency care or assistance.

(2) Subsection (1) includes a person properly trained under the laws of this state who operates an ambulance to and from the scene of an emergency or renders emergency medical treatment on a volunteer basis so long as the total reimbursement received for such volunteer services does not exceed 25% of his gross annual income or $3,000 a calendar year, whichever is greater.

(3) If a nonprofit subscription fire company refuses to fight a fire on nonsubscriber property, such refusal does not constitute gross negligence or willful or wanton act or omission.

According to the legislative history of § 27-1-714, MCA, (Good Samaritan Statute) it was passed by the Legislature in 1963, amended by § 1, Chapter 390, Laws of Montana 1979, and § 1, Chapter 330, Law of Montana 1985, and § 1, Chapter 133, Laws of Montana 1987. Reference is made to the legislative history of the Good Samaritan Statute because this is a first impression case in this state on the interpretation of the Good Samaritan Statute.

This Court has considered appellant McCain's initial brief and reply brief and her argument appears to be that the Good Samaritan Statute has no application to her situation. McCain alleges that Dr. Batson was not a good samaritan and recognizes that the Good Samaritan Statute provides immunity from his malpractice. McCain first argues that a physician must demonstrate that he is a member of a protected class.

7

Dr. Batson was not a licensed physician in the state of Montana, although he is licensed to practice in Wyoming and Idaho. McCain argues he is, therefore, any person within the meaning of the statute. While she agrees with the fact that the doctor here is protected under the act, she alleges that immunity only attaches to malpractice which is committed at the scene of the accident or emergency.

She argues that after falling into the excavation pit, McCain crawled to Dr. Grindley's condominium and she was later carried to Warner's condominium. Therefore Dr. Batson's care, such as it was, was too remote in time and location to the scene of the accident. She alleges with this result Dr. Batson could not demonstrate that this was an "emergency" situation. McCain further argues that Dr. Batson's negligent care was performed when he made a "housecall" and he did not happen upon an emergency. McCain argues that because Dr. Batson's negligent care was not during an emergency situation, though her injuries were serious, they were not life threatening and therefore the best course of action would have been to postpone care until she reached a hospital.

We, as the District Court did, have difficulty with this argument. The central question presented to the District Court and one which is subject to our review is whether the Good Samaritan Statute applies. We find, as the District Court did, that it does. Thus, the standard of review is gross negligence and willful or wanton acts or omissions rather than ordinary negligence--medical malpractice. We agree with the District Court's finding that after reviewing all of the deposition testimony, there is no evidence whatsoever that there was such a serious level of

8

negligence exhibited by Dr. Batson to warrant any action in this case.

The District Court noted the problem here was not that there were differing versions of the facts but that the facts were not ultimately pertinent to the decision. Only two of the depositions indicate a fact variance. One is the deposition of the appellant, McCain, which is to say the least self-serving; second is the deposition of Dr. Grindley who testified that he disagreed with the decision of Dr. Batson in suturing the wound. Dr. Grindley added that the manner of Dr. Batson's suturing indicated to him some permanence of treatment. However, on cross-examination it should be noted that it was Dr. Grindley's opinion that there was neither gross negligence nor gross malpractice in this. During the cross-examination Dr. Grindley was asked a number of questions which are illustrative of his position.

> Q. I get the impression that your biggest criticism is the fact that he sutured it.
>
> A. Yes. I just don't know what the need for it was, you know, if he was intending for her to go to the hospital right away and having it, you know, treated further.
>
> Q. Now do you know what gross negligence is on the part of a doctor as opposed to ordinary malpractice or ordinary negligence?
>
> . . .
>
> THE WITNESS: No, I guess I really couldn't give you a real good definition of that. I imagine it's where you had some idea maybe that you were operating out of the boundaries that you should be operating in or working in as a physician.

BY MR. CEBULL [respondent's attorney]:

Q. Well are you critical of anything that Dr. Batson did other than suturing the wound?

A. I'm not sure, you know, really what he did. You've told me what he did and, no, I couldn't say that I could be critical because I really don't know what else he did. I haven't read those depositions or anything so I don't know.

Q. But you are critical of the suturing, right?

A. Right. I really just don't know why you would put sutures in and then send someone off to the emergency room to have the wound treated further.

Q. And then as I understand it, you arrived at this opinion, or you arrived at this criticism of Dr. Batson for him placing the sutures in the wound before you came here today, didn't you?

A. Yes.

Q. Okay. Now in your opinion, was the placement of those sutures in the wound by Dr. Batson gross negligence?

A. I don't know where he placed them. Do you mean just putting them in there?

Q. I mean just the fact that he sutured the wound. That's my understanding of your criticism of Dr. Batson.

A. I don't know that I would call it gross negligence, but it's just -- it's not the customary thing that a physician would do in treating -- giving first aid to a wound, in other words.

10

Q. Well, generally, you know that if a physician violates an acceptable standard of care, that's malpractice, negligence, you know that, don't you?

A. Uh huh.

Q. Okay. And I get the impression that you are saying that Dr. Batson's suturing this wound was a violation of an acceptable standard of care.

A. I would think so. I think if he intended to -- had thought that he had debrided it and cleaned it out thoroughly and had done the primary care of the wound and sutured it then, I wouldn't have much argument with that. But from what you tell me, where he puts just a few sutures in it and then sent her off to the emergency room to have it further treated, I say why? Why subject a patient to sticking them with a needle and whatever you do to put sutures in just to have them taken out in an hour or so, so it can be cleaned out?

Q. Well, what have you been told about whether this was temporary or permanent, final suturing?

A. Well, you just alluded to it a while ago.

Q. I know, but have you been told anything before that?

A. I'm not sure that I have.

Q. Well, if Dr. Batson had intended this to be a final repair job and he had debrided it and cleansed it, at least in his judgment as good as he could, would the fact that an infection occurred later on indicate to you that he committed malpractice?

11

A. No. Because a certain percentage of wounds, like I said, would get infected regardless of how thorough a job you do of cleaning them.

Q. Even if they are done in a hospital in an OR suite with general anesthesia and everything, right?

A. Right.

Q. Well, in your opinion, if this was a temporary suturing job by Dr. Batson, did that, in your opinion, constitute gross negligence, gross malpractice?

A. Well, you see you really haven't told me what gross malpractice is yet or gross negligence.

Q. Well, it's a heck of a lot worse than ordinary malpractice.

A. I guess in my opinion I still would say -- I would say it's what most people, most physicians would not do that if they expected the patient, within an hour or so, to be at a facility where they would have it done and so why do it?

Q. Okay.

A. When a dressing will do the same thing.

Q. Are you going to testify in this case that Dr. Batson committed gross malpractice, gross negligence, in suturing that wound if it was a temporary repair?

A. From your description of gross negligence, I would probably say no. You see, I might change my mind. You've made a lot of this hypothetical and you said that if he had all of the equipment available, if everything was in that box

12

and he had some other things available, you know, could he have done it. And I said yes but, you know, it was my opinion that I was not about to sew up that kind of a wound, you know, with the equipment I could see in the box there and feel like I was doing a service to the patient.

Dr. Grindley later testified in deposition:

Q. Well, apparently before today you had formulated an opinion that Dr. Batson had committed at least ordinary malpractice, ordinary negligence, right?

A. I wouldn't say that. I just think he's braver than I was to try to -- you know, if he was going to try to do primary care of that wound there in some condominium or in his wherever he was staying, you know, he was braver than I was to attack that kind of situation without what I would like to have available, you know, to do it, and if he was doing it just kind of as a first aid thing, then I really have no idea why he would put sutures in the patient's leg.

When questioned later regarding deposition testimony from McCain's treating physicians in Utah, one being a plastic surgeon and the other being a general practitioner, Dr. Grindley answered as follows:

Q. Now these physicians down in Utah, their depositions have been taken -- the one a plastic surgeon and another I'm not really sure what his specialty was, but you don't know what they have said about this?

A. No, I don't.

Q. If they said that, in their opinion, Dr. Batson didn't commit malpractice in

13

> any way, you would disagree with them then, I guess.
>
> A. I couldn't really -- you know, it just comes back to the same thing, you know, I don't know actually what he did do, I didn't see what he did work with, whether he was doing a primary closure with it. And if I could see what he had used and if I felt it was appropriate, then I would say, you know, it probably was appropriate treatment for her. But, you know, just to put stitches into a wound like this and send someone off to the hospital to have it further repaired, I just don't think that's customary practice.

When asked if he offered to treat McCain's wound, Dr. Grindley stated:

> No. Just like I said earlier, I just told her that I technically could repair the wound with what she had there [Warner's medical kit], but that I just felt that I would not want to do it without having a better circumstance to debride the wound thoroughly and thoroughly cleanse it and irrigate it before it was sewn up.
>
> . . .
>
> Well, what I was basically saying was that I wouldn't do it and I felt like they ought to go to the nearest hospital, which was in Ashton, Idaho, and their car wasn't starting and I told them that I would be glad to take them over there to Ashton if they wanted me to.

It is interesting to note that from the time the first Good Samaritan Statute was passed in 1959, up until 1981, only fourteen reported cases in other jurisdictions dealt with those jurisdictions' statutes, and only five cases where

14

the statute was found applicable. See, Good Samaritan Laws--Who Needs Them?: The Current State of Good Samaritan Protection in the United States, 21 S.Tex.L.J. 341 at 350 (1981).

A review of Good Samaritan statutes of other states indicates that the medical situation must be an emergency situation before immunity can be invoked, yet few states have defined the term "emergency" in their statutes, 21 S.Tex.L.J. at 346. In Colby v. Schwartz (1978), 78 Cal.App.3d 885, 144 Cal.Rptr. 624, the California Court of Appeals addressed the competing interest in numerous other states' statutes. In Colby that court set forth the reason for the enactment of the Good Samaritan statutes. That court noted:

> The enactment of Good Samaritan legislation represents the resolution of competing interests. On the one hand, there is an interest in the vindication of the rights of the malpractice victim. On the other hand, there is the need to encourage physicians to render emergency medical care when they otherwise might not. Where applicable, the legislation favors the latter over the former.

Colby, 78 Cal.App.3d at 893-894, 144 Cal.Rptr. at 628-629. We find that that is the central reason for the legislation here in Montana and that the standard of review is one of gross negligence and willful or wanton acts or omissions, rather than ordinary negligence/medical malpractice.

Here Dr. Batson rendered temporary first-aid with limited medical equipment having been awakened early in the morning to do this for McCain and thereafter having warned her and her two companions that it was necessary to obtain immediate care both in Ashton, Idaho and when she got home to Ogden, Utah. As previously noted all parties agree, except

15

McCain and Dr. Grindley, that what was done under the circumstances was a first-aid treatment by Dr. Batson with directions to immediately seek help when she got home and the fact that she waited over a week before seeking further medical treatment resulted in infection and the necessary surgery that followed. McCain's treating physician and treating surgeon both testified that under the circumstances what Dr. Batson did was neither negligent nor malpractice.

As we have previously noted in the testimony of Dr. Grindley, he did not and could not testify that Dr. Batson was guilty of gross negligence or willful or wanton acts or omissions. Absent any proof of gross negligence on the part of Dr. Batson, McCain claims that the Good Samaritan Statute did not apply to the facts of this case, and that therefore proof of ordinary negligence is all that she had to prove in her claim against Dr. Batson. She does this by arguing that summary judgment was improper. The general rule surrounding summary judgment and whether it should or should not be granted has been well set forth in the decisions of this Court. As respondent noted we need not go to the Eighth Circuit, the states of Indiana, Louisiana and Hawaii for decisions regarding the appropriateness of summary judgment.

Rule 56(c), M.R.Civ.P. provides for a case of this type. In Shimsky v. Valley Credit (1984), 208 Mont. 186, 676 P.2d 1308, this Court held that when a case is disposed of below on a motion for summary judgment before a judge sitting without a jury and no testimony is taken as the facts are relatively uncontested, the scope of review is much broader than in other appeals and the Supreme Court is free to make its own examination of the entire case and reach a conclusion in accordance with its findings. Shimsky, 676 P.2d at 1310.

16

Furthermore, the Court will uphold the result below if it is correct, regardless of the reasons given below for the result. See, Montana Department of Natural Resources and Conservation v. Clark Fork Logging Co., Inc. (1982), 198 Mont. 494, 646 P.2d 1207.

Here the District Court very carefully noted the elements contained in § 27-1-714, MCA, Montana's Good Samaritan Statute:

> Any person licensed as a physician and surgeon under the laws of the State of Montana, . . . or any other person who in good faith renders emergency care or assistance without compensation . . . at the scene of an emergency or accident is not liable for any civil damages for acts or omissions other than damages occasioned by gross negligence or by willful or wanton acts or omissions by such person in rendering such emergency care or assistance.

The District Court carefully noted the plaintiff's contention, that Dr. Batson offered care gratuitously and for no compensation, the plaintiff's concession that Dr. Batson was in a protected and immune class, the plaintiff's denial that there was an emergency at the scene of the accident and the plaintiff's conclusion, therefore, that the act does not apply in this case.

The court carefully analyzed the testimony that was given and finds that there was an "emergency" situation and no gross negligence or willful or wanton acts were committed. The court further found that all of the elements of the Good Samaritan Statute were met and that its standard of gross negligence applied to the facts in this case. While this Court generally prefers a trial on the merits of a case to dismissal by summary judgment, we affirm the District Court

17

in its findings.   We are willing to look at the facts presented and not force a defendant to go through a prolonged, expensive and emotionally debilitating trial for such well intended and medically accepted deeds as Dr. Batson performed at West Yellowstone, Montana.   The relevant and material facts point to this conclusion and the ultimate question is a matter of law.   We further agree with the District Court in this case that Dr. Batson was a good samaritan, that he acted in an emergency, and since there has been no showing of gross negligence, the decision of the District Court to grant summary judgment is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

18

Justice John C. Sheehy, dissenting:

The recent penchant of this Court to approve summary judgments from the District Court where genuine issues of material fact exist is shown again in this case. There are two genuine issues of material fact presented here: (1) whether an emergency existed requiring, as a good samaritan, the assistance of Dr. Batson; and (2) if the answer to the first query is affirmative, whether Batson was guilty of gross negligence; and if the answer is no to the first query, whether he was guilty of ordinary negligence.

We said in Kronen v. Richter (Mont. 1984), 683 P.2d 1315:

> Summary judgment is never to be used as a substitute for trial if a factual controversy exists (citing a case). Summary judgment is only proper if the pleadings, depositions, answers to interrogatories and admissions on file show that there is no genuine issue of material fact (citing a case) . . .

683 P.2d at 1317.

In granting a motion for summary judgment, the discretion of the District Court, and of this Court in reviewing documents is limited.

> A discussion of discretion divides into two parts: Discretion in granting and in denying a motion for summary judgment. As we shall see, the Court cannot draw upon any discretionary power to grant summary judgment; the Court may however exercise its sound discretion in denying a motion of summary judgment although on the record the movant has made out a case therefor.

6 Moore's Federal Practice (Part II), page 56-601, ¶ 56.15[6] (1987).

The plaintiff has lost this appeal because the facts are not appealing. The District Court expressed the problem:

- 19 -

> The court would admit to some problems of keeping an impartial perspective in this case, but is satisfied, when all is said and done, that this is a fair decision based on thorough research, sufficient facts, and clear rules of law. Nonetheless, the court cannot help but wonder where our society is taking itself by bringing cases like this to the courtroom. We may be well on our way to making an endangered species out of good samaritans who are forced to stifle their good impulses out of fear of being taken to court. If this is the trend, it is indeed unfortunate.

The other side of that coin is that if Karen McCain has sustained serious and permanent damages to her leg because Dr. Batson, instead of rendering aid sufficient for the moment, in effect, "overtreated" her, she is entitled to have her case heard in court, even though Dr. Batson acted from the best of impulses.

The first issue here was whether an emergency existed at the time of Dr. Batson's treatment. The District Court balanced those issues of fact and decided that an emergency existed. In doing so, it determined a question of fact, an improper procedure where summary judgment is concerned.

First, the District Court ticked off the facts which contended for no emergency: There was no major blood loss; her life was not in danger and she was not going to die; she would not lose the limb; the leg had a numb sensation and there was an absence of pain immediately following the injury; and she was neurologically intact. Opposing that, said the court, was that the witnesses agreed the cut was extremely serious, possibly bone deep; there was no hospital in town; the Ashton hospital had no anesthesia facilities; there was no available ambulance; no police officer or other friends to provide transportation to a hospital; and reason to believe the "limb was at risk." Not mentioned by the District Court was the testimony of Dr. Grindley that a

simple dressing would suffice under the circumstances, and that suturing the wound presented a case of final repair.

Since there existed a genuine issue of material fact, one that should have been decided by a trier of fact, such as a jury, the issue should not have been decided on summary judgment.

The second issue of fact was whether the attendance by the doctor in this case constituted either ordinary or gross negligence. The majority, without defining gross negligence in this instance, has determined that there was no gross negligence on the part of the defendant doctor. None of the witnesses defined what was meant by gross negligence. The only definition on which this Court relies is the following:

> Q. Well, in your opinion, if this was a temporary suturing job by Dr. Batson, did that, in your opinion, constitute gross negligence, gross malpractice?
>
> A. Well, you see you really haven't told me what gross malpractice is yet or gross negligence.
>
> Q. Well, it's a heck of a lot worse than ordinary malpractice.

If any District Court in Montana had given a jury an instruction that so defined gross negligence, we would in high dudgeon reject it as inadequate. Here, the majority, without otherwise defining gross negligence as it applies under the Good Samaritan statute, undertakes no other definition to resolve the fact issue of gross negligence.

We might entertain in ourselves a serious doubt that the plaintiff would prevail if she had been permitted to take her case to a jury to resolve the fact issues. Our personal feelings about the propriety of a case have no place in deciding questions on summary judgment. If issues of fact exist, as Professor Moore notes, supra, there is no

discretion, in our Court or in the District Court, to grant summary judgment.

I would reverse and remand for further proceedings.

John C. Sheehy
Justice