672 A.2d 480 (1995)
David N. HARDINGHAM
v.
UNITED COUNSELING SERVICE OF BENNINGTON COUNTY, INC., et al.
No. 94-096.
Supreme Court of Vermont.
December 22, 1995.
*481 John D. Shullenberger of Mickenberg, Dunn, Sirotkin & Dorsch, Burlington, for plaintiff-appellant.
Stephen G. Norton and John G. Beiswenger of Paul, Frank & Collins, Inc., Burlington, for defendants-appellees United Counseling Service, Halpin, O'Brien and Gordon.
Pietro J. Lynn of Dinse, Erdmann & Clapp, Burlington, for defendant-appellee Kowalski.
PRESENT: GIBSON, DOOLEY, MORSE and JOHNSON, JJ., and BURGESS, District Judge, Specially Assigned.
GIBSON, Justice.
Plaintiff David Hardingham, who was blinded as the result of drinking windshield wiper fluid during an alcoholic binge, appeals the superior court's orders granting summary judgment in favor of defendants, whom plaintiff accused of negligently assisting him while he was intoxicated. In an earlier opinion, Hardingham v. United Counseling Service of Bennington, ___ Vt. ___, 667 A.2d 289 (1995), we resolved all issues raised on appeal except for the issue of whether the superior court erred in ruling that, as a matter of law, defendants' conduct did not amount to gross negligence. We ordered the parties to reargue this issue, on which the original four-member panel was equally divided. Upon reargument, we reject plaintiffs argument that the superior court usurped the role of the jury by concluding, as a matter of law, that defendants were not grossly negligent in aiding him. Accordingly, the court's grant of summary judgment in favor of defendants is affirmed.

I.
We restate the relevant facts set forth in our earlier opinion. In November 1987, defendant United Counseling Service (UCS), a private, nonprofit organization providing counseling and psychiatric treatment to persons with mental illness, mental retardation, or substance-abuse problems, employed *482 plaintiff, a known recovering alcoholic, as an emergency services counselor. On February 3, 1988, defendant John Halpin, United Counseling Service's executive director, became aware that plaintiff was drinking again. After failing to persuade plaintiff to seek psychological and medical attention, Halpin asked defendant Larry Gordon, UCS's coordinator of emergency services, to visit plaintiff. Gordon went to plaintiff's apartment on February 4 and found him in an inebriated condition. When plaintiff refused to seek treatment, Gordon called plaintiff's estranged wife, the emergency room at Southwestern Vermont Medical Center (SVMC), the police, and the Bennington Rescue Squad, but nobody was willing to take any action without plaintiff's cooperation. Gordon left plaintiff's apartment and took all the alcohol he could find. During a telephone conversation the next day, plaintiff told defendant David O'Brien, UCS's director of outpatient services, that he would enter a treatment program.
On February 11, Halpin went to plaintiff's apartment and discovered plaintiff in an inebriated, semi-conscious state. Halpin returned to UCS and explained plaintiffs condition to Gordon, O'Brien, and defendant Donald Kowalski, a psychiatrist and UCS's medical director. The three men went to plaintiffs apartment and found it in disarray. While the men were at the apartment, plaintiff got up, went to a sink, and began to drink from an apparently full container of windshield wiper fluid. O'Brien and Kowalski immediately took the container away from plaintiff, and Gordon called the police. Notwithstanding plaintiff's vehement protests, the three men took him outside and helped police place him in the back of a patrol car. The police took plaintiff to the SVMC emergency room. Kowalski rode with plaintiff in the patrol car, but did not go into the hospital; instead, Gordon and O'Brien accompanied plaintiff to the emergency room.
At the emergency room, plaintiff refused to take a blood test despite Gordon's request that he do so. When plaintiff would not agree to go to a residential treatment program, Gordon signed an incapacitation order, and plaintiff was taken to the Rutland Regional Correctional Center. At no time did any of the three men inform police, emergency room personnel, or corrections employees that plaintiff had ingested, or had attempted to ingest, a bluish liquid that may have been windshield wiper fluid. The following morning, plaintiff was admitted to the Rutland Medical Center and placed in the intensive care unit. Tests revealed the presence of methyl alcohol in plaintiffs blood in sufficient concentration to present a threat to his life. As a result of the methanol overdose, plaintiff suffered severe health problems, including blindness.
In his complaint, plaintiff alleged that defendants were negligent in failing to inform medical authorities that he had ingested windshield wiper fluid. Defendants sought summary judgment. The superior court granted their motions based on its conclusion that, as a matter of law given the facts of the case, (1) Vermont's Duty to Aid the Endangered Act, 12 V.S.A. § 519, immunized defendants from civil liability for acts of ordinary negligence, and (2) defendants' actions were not grossly negligent. On reargument, plaintiff contends that the superior court usurped the role of the jury by concluding, as a matter of law, that defendants' actions did not constitute gross negligence.

II.
The concept of gross negligence has been defined by this Court in the context of our repealed guest-passenger statute. Deyo v. Kinley, 152 Vt. 196, 207-08, 565 A.2d 1286, 1293 (1989). In that context, we stated that gross negligence is "`more than an error of judgment, momentary inattention, or loss of presence of mind'"; rather, "`it amounts to a failure to exercise even a slight degree of care'" and an "`indifference to the duty owed [to another].'" Rivard v. Roy, 124 Vt. 32, 35, 196 A.2d 497, 500 (1963) (quoting Emery v. Small, 117 Vt. 138, 140, 86 A.2d 542, 543 (1952)); see Shaw, Adm'r v. Moore, 104 Vt. 529, 531, 162 A. 373, 374 (1932) ("Gross negligence is substantially and appreciably higher in magnitude and more culpable than ordinary negligence.... It is a heedless and palpable violation of legal duty respecting the rights of others.").
*483 Although the presence or absence of gross negligence turns on each particular set of circumstances and therefore is "generally a question for the jury," the trial court may decide the question as a matter of law "where the minds of reasonable persons cannot differ." Rivard, 124 Vt. at 35, 196 A.2d at 500. Several courts in other jurisdictions have granted summary judgment to rescuers on the ground that, as a matter of law, the plaintiffs had failed to show that the rescuers were grossly negligent in providing assistance, as required by the jurisdictions' Good Samaritan statutes. See, e.g., Ambrose v. New Orleans Police Dep't Ambulance Serv., 639 So.2d 216, 223 (La.1994) (delay by emergency medical technicians in taking victim to hospital did not evidence gross negligence; therefore, jury verdict must be overturned); Tatum v. Gigliotti, 80 Md.App. 559, 565 A.2d 354, 358 (1989) (acts of paramedics may have amounted to negligence, but not gross negligence; directed verdict affirmed); Mallory v. City of Detroit, 181 Mich.App. 121, 449 N.W.2d 115, 118 (1989) (summary judgment affirmed for same reasons); Higgins v. Detroit Osteopathic Hosp. Corp., 154 Mich.App. 752, 398 N.W.2d 520, 524 (1986) (at most, plaintiff's evidence showed that defendant doctor was guilty of ordinary negligence in misreading plaintiff's x-rays and treating her according to misread x-rays; trial court did not err in granting defendant's motion for directed verdict on basis of Good Samaritan statute); McCain v. Batson, 233 Mont. 288, 760 P.2d 725, 732 (1988) (affirming summary judgment ruling on ground that plaintiff failed to show gross negligence on part of good samaritan doctor); Wicker v. City of Ord, 233 Neb. 705, 447 N.W.2d 628, 634-35 (1989) (ambulance attendants may have been negligent in failing to follow protocol for terminating cardiopulmonary resuscitation, but no reasonable person could have concluded that their actions were grossly negligent; trial court properly granted summary judgment to defendants); Rodriguez v. New York City Health & Hosps. Corp., 132 Misc.2d 705, 505 N.Y.S.2d 345, 347 (Sup.Ct.1986) (summary judgment granted because of plaintiff's failure to demonstrate, or even allege, gross negligence on part of physician who arranged for neighbor to take her to hospital); Young-blood v. Schireman, 53 Wash.App. 95, 765 P.2d 1312, 1320 (1988) (delay by parents of assailant in getting victim to emergency room was not gross negligence that could give rise to liability under Good Samaritan statute).
When the facts do not present triable issues, courts must be especially vigilant in protecting rescuers from protracted litigation, particularly in view of the fact that the Legislature created partial immunity under 12 V.S.A. § 519 largely to allay the litigation fears of medical professionals and other would-be rescuers. See Note, Duty to Aid the Endangered Act: The Impact and Potential of the Vermont Approach, 7 Vt.L.Rev. 143, 156 (1982). The purpose of the Duty to Aid the Endangered Act is to encourage rescuers to assist others in danger by penalizing them for not acting while at the same time shielding them from civil liability for acts of ordinary negligence committed during the rescue. If rescuers were forced to go through an expensive trial any time there was the slightest evidence of ordinary negligence, even if it were clear that gross negligence was not present, the purpose of the statute would be thwarted. Cf. McCain, 760 P.2d at 732 (defendant physician should not be forced "to go through a prolonged, expensive and emotionally debilitating trial for such well intended and medically accepted deeds"); Rodriguez, 505 N.Y.S.2d at 347-48 (physician who does little more than arrange for neighbor to be taken to hospital under emergency conditions should not remain in lawsuit).
Here, plaintiff neither demonstrated nor pled gross negligence against defendants. It is undisputed that the individual defendants visited plaintiff at his apartment, became alarmed at his condition, summoned the authorities, took the container of windshield wiper fluid away from him as he attempted to drink from it, physically removed him from his apartment so that he could be transported to the hospital, accompanied him to the hospital, and tried to get him to accept appropriate medical treatment. As the trial court noted, defendants' actions probably saved plaintiffs life. Given these facts, no reasonable person could conclude that defendants *484 showed indifference to plaintiff or failed to exercise even a slight degree of care. We agree with the trial court that defendants' failure to tell medical personnel, during the course of an emergency room visit with a highly intoxicated and belligerent person, that plaintiff may have consumed a toxic substance demonstrates, at most, an error of judgment or a loss of presence of mind that could be viewed as negligent, but not grossly negligent. Accordingly, defendants cannot be liable in civil damages, and summary judgment in favor of defendants was proper. See Kelly v. Town of Barnard, 155 Vt. 296, 305 n. 5, 583 A.2d 614, 619 n. 5 (1990) (where record as whole could not lead rational trier of fact to find for nonmoving party, there is no genuine issue for trial).
The dissent emphasizes that the particular facts of each case should determine whether gross negligence exists. We agree, but conclude that the particular facts of this case are such that a jury could not reasonably determine that defendants were grossly negligent in aiding plaintiff. We reject the notion that because there is no clear dividing line between ordinary negligence and the statutory standard of gross negligence, the jury must determine the existence of gross negligence in all cases, regardless of the facts.
Affirmed.
DOOLEY, Justice, dissenting.
I disagree with the court's conclusion that there was insufficient evidence for a jury to find that defendants were grossly negligent. Accordingly, I dissent.
The narrow question that divides us is as follows:
Whether the medical director of a crisis intervention and alcohol treatment agency, who observes an intoxicated person drink windshield wiper fluid, can be found grossly negligent when he obtains medical assistance for the intoxicated person but fails to inform the medical care provider that the intoxicated person drank windshield wiper fluid.
The question is replicated for the other defendants, each of whom has a position of responsibility in the crisis intervention and alcohol treatment agency.
We have said that "decided cases are of little assistance in determining the existence of gross negligence under the evidence in a particular case. Each case turns almost entirely on its own peculiar factual situation." Langdon-Davies v. Stalbird, 122 Vt. 56, 57, 163 A.2d 873, 874-75 (1960). The facts here are particularly telling. Defendants obtained emergency medical assistance and accompanied plaintiff to the emergency room, but failed to tell the emergency room physician the most significant fact that wasn't obvious from plaintiff's conditionthat plaintiff had consumed windshield wiper fluid. The result was that plaintiff was diagnosed at the emergency room with "depression and acute intoxication" for which the obvious treatment was "detoxification." The emergency room doctor's report is significant in this respect:
Attempt was made to obtain blood this evening, but the patient refused this to be done. There being no evidence of acute emergency, I did not force this issue.
There was no evidence of "acute emergency" because defendants failed to tell the emergency room doctor what plaintiff had ingested. Because no blood work was done, the hospital did not diagnose a methanol overdose. Without treatment for the ingestion of methanol, plaintiff lost his sight.
I have no doubt that the greatest difficulty plaintiff faces in this case is to persuade us to accept that "good samaritans" should ever be liable. Thus, this Court's response to plaintiff's claim appears to be that the deficiencies in defendants' response must be viewed in the context of all the positive and effective actions they took to save plaintiff. The trial court emphasized that defendants' actions "very probably saved [plaintiff's] life." Both approach the case as if we are to do some sort of balancing, weighing the positive interventions, against those that proved to be harmful.
The Duty to Aid the Endangered Act clearly commands a different approach. It recognizes that, despite their best intentions, rescuers can be negligent and harm can result from that negligence, but limits liability to actions that are grossly negligent. If we *485 consider defendants' positive acts of assistance as bearing on whether they were grossly negligent, however, there will never be liability in any emergency medical care situation. The Legislature has not adopted this "immunity" approach.
I do not believe that the general language we have used to describe gross negligence is very helpful when viewed apart from the decisions that have applied the language. Thus, the majority fixes on our description of gross negligence as involving absence of "even a slight degree of care." We have, however, applied that language to allow a jury to find gross negligence where a motorist, traveling 10 miles per hour under the speed limit, lost control of her vehicle when she abruptly applied her brakes after hearing the sound of small stones hitting her fender. Langdon-Davies, 122 Vt. at 57, 58, 163 A.2d at 874, 875. We also applied it to a motorist who, while driving 40 to 45 miles per hour on a highway, failed to negotiate a curve and left the road. Abel v. Salebra, 115 Vt. 336, 337-38, 341, 61 A.2d 605, 606, 608 (1948). Our decisions make clear that we have not adopted a wooden and narrow application of the definition of gross negligence.
As a demonstration that decided cases are generally unhelpful to determining whether there is sufficient evidence to get to the jury on gross negligence, I invite the reader to examine the decisions from outside Vermont cited by the majority.[*] Two of these decisions turn on the fact that the injured party made no real claim of gross negligence. See Rodriguez v. New York City Health & Hosp, Corp., 132 Misc.2d 705, 505 N.Y.S.2d 345, 347 (Sup.Ct.1986) ("not only do [plaintiff's papers] never set forth any allegations of specific acts of negligence, but ... the complaint never even mentions allegations of gross negligence.... [The opposition has] failed to come forward with any evidentiary facts showing malpractice by [defendant]."); Mallory v. City of Detroit, 181 Mich.App. 121, 449 N.W.2d 115, 118 (1989) (complaint contains only general allegations of negligence insufficient to be claims of gross negligence). In this case, after the initial pleading, plaintiff made it clear in response to defendants' motion for summary judgment that he claimed defendants were grossly negligent, and he detailed that claim. The trial court analyzed the claim of gross negligence, and no party has argued that it is not properly before us. Rodriguez and Mallory are simply inapplicable.
Tatum v. Gigliotti, 80 Md.App. 559, 565 A.2d 354, 358 (1989), might be more helpful to defendants. In that case, however, there was a trial (not a decision on summary judgment) followed by a directed verdict because plaintiff relied upon an expert witness who failed to state that defendant was grossly negligent. More important, Maryland law equates gross negligence with wilful and wanton misconduct, see id., so the degree of defendant's culpability must be much higher in Maryland than in Vermont. See Sorrell v. White, 103 Vt. 277, 282-85, 153 A. 359, 361-63 (1931) (distinguishing gross negligence and wilful negligence).
Although on initial reading Ambrose v. New Orleans Police Dep't Ambulance Serv., 639 So.2d 216, 223 (La.1994), McCain v. Batson, 233 Mont. 288, 760 P.2d 725, 732 (1988), Wicker v. City of Ord, 233 Neb. 705, 447 N.W.2d 628, 634-35 (1989), and Youngblood v. Schireman, 53 Wash.App. 95, 765 P.2d 1312, 1320 (1988), appear helpful to defendants, it is hard to see how there is any negligent conduct at all in their facts. Indeed, the court said as much in McCain, 760 P.2d at 732 (defendant's actions were "well intended and medically accepted deeds"). In comparison, the degree of culpability that the jury could find here is much greater.
In my view, more relevant and helpful precedents are Fox v. Oklahoma Memorial Hosp., 774 P.2d 459, 462 (Okla.1989); Bloom v. Dubois Regional Medical Ctr., 409 Pa.Super. 83, 597 A.2d 671, 679-80 (1991); Wheeler v. Yettie Kersting Memorial Hosp., 866 S.W.2d 32, 50-51 (Tex.Ct.App.1993), cases where the appellate court held that the issue of gross or willful or wanton negligence had to go to the jury. I reemphasize, however, that this case should not be decided based on decisions from other states that the reader *486 thinks involve similar facts. Juries, not appellate courts, should decide whether defendants' inaction was so culpable that it amounted to actionable gross negligence.
As strongly as I disagree with the majority's analysis of the facts in light of the standard for summary judgment, my real differences are in the policy perspectives from which we approach this case. The majority approaches the Duty to Aid the Endangered Act as an immunity statute so we "must be especially vigilant in protecting rescuers from protracted litigation." I disagree with this analysis and approach. The main effect of the statute, unlike other Good Samaritan statutes adopted in this country, was to expand the limited common-law duty to rescue a person "exposed to grave physical harm" when the rescue can be achieved without danger or peril to the rescuer and without interference with important duties owed to others. See 12 V.S.A. § 519(a); see generally Franklin, Vermont Requires Rescue: A Comment, 25 Stan.L.Rev. 51 (1972). This expanded duty was accompanied by a higher threshold of culpability before the rescuer could be found liable, but I think it is a mischaracterization to call this an immunity statute.
On this point, it is important to distinguish the Good Samaritan statutes that have been passed in other states. Many, modeled after the California statute, give the "good samaritan" immunity from any suit as long as the rescue action was taken in good faith. See Cal.Bus. & Prof.Code § 2395 (West 1990). Others allow suits against the rescuer only if based on willful or wanton misconduct, which typically requires actual or implied intent to injure. See Ohio Rev.Code Ann. § 2305.23 (Anderson 1995). If the Vermont Legislature had passed one of these variations, the majority's decision here would have been fully supported, and I would agree with its policy rationale. The majority, however, reads too much into the statute that the Legislature actually passed.
Unfortunately, this is a lesson we once learned the hard way, and I fear history is repeating itself. In 1929, the Vermont Legislature, following the lead in other states, passed a statute providing that a guest-passenger who is injured in an automobile accident could sue the operator only for gross or willful negligence. Sorrell, 103 Vt. at 280, 153 A. at 360. In the forty years the statute was in effect until repealed in 1969, it spawned a flood of appeals to this Court, and decision after decision attempted to find the line between gross and ordinary negligence. In retrospect and in light of that experience, we found the terminology of the guest statute to be "ineffective as a definition of duty," Green v. Sherburne Corp., 137 Vt. 310, 313, 403 A.2d 278, 280 (1979), and we characterized our experience with the gross negligence test for liability as "unsatisfactory." Howard v. Spafford, 132 Vt. 434, 435, 321 A.2d 74, 75 (1974). In these assessments, we were echoing those of many courts and commentators who found the line-drawing required by the gross negligence standard difficult, if not impossible, to perform in a principled fashion. See Note, The Present Status of Automobile Guest Statutes, 59 Cornell L.Rev. 659, 670 (1974) (because of terminology, application of guest laws has been characterized by "uncertainty and lack of uniformity" so that "the field has been thrown into a state of mass confusion"); W. Keeton, Prosser & Keeton on Torts § 34, at 216 (5th ed. 1984) (guest statutes filled courts with "knotty little problems" such as the meaning of gross negligence).
Like many other courts, we found that the only reasonable course of action was to leave the decision of whether gross negligence was present to the jury except in the most extreme cases. See, e.g., Hodges v. Helm, 222 So.2d 418, 420 (Fla.1969) (distinctions between degrees of negligence not too complex to be left to the jury); Comment, Gross Negligence: Excessive Speed and the Guest Statute, 22 U.Fla.L.Rev. 326, 330 (1969) (import of Hodges is that "justice may best be served when the question of the degree of negligence under the guest statute is placed before the jury for adjudication"). Thus, our early decisions attempted to draw fine lines, and roughly half the decisions found there was enough evidence to go to the jury, see, e.g., Dessereau v. Walker, 105 Vt. 99, 102, 163 A. 632, 633 (1933), and half found insufficient evidence to reach the jury. See, e.g., *487 Garvey v. Michaud, 108 Vt. 226, 233-34, 184 A. 712, 715 (1936). The last ten decisions, however, found sufficient evidence to reach the jury on gross negligence. See Rivard v. Roy, 124 Vt. 32, 36, 196 A.2d 497, 500-01 (1963); Cross v. Estate of Patch, 123 Vt. 11, 17, 178 A.2d 393, 398 (1961); Langdon-Davies, 122 Vt. at 58, 163 A.2d at 875; Chamberlain v. Delphia, 118 Vt. 193, 196, 103 A.2d 94, 95 (1954); Emery v. Small, 117 Vt. 138, 141, 86 A.2d 542, 543 (1952); Abel, 115 Vt. at 341, 61 A.2d at 608; Huestis v. Estate of Lapham, 113 Vt. 191, 195, 32 A.2d 115, 117-18 (1943); Barrows v. Powell, 113 Vt. 109, 112, 29 A.2d 708, 710 (1943); Peck v. Gluck, 113 Vt. 53, 56, 29 A.2d 814, 815 (1943); Kerin v. Coates, 112 Vt. 466, 470, 28 A.2d 382, 384 (1942). Increasingly, the rationale for these decisions was contained in words like these: "Under the facts of this case, this Court cannot say that the evidence as disclosed by the transcript was such that, in the light of the testimony at the time [the] ruling was made, reasonable men would all agree that the result contended for by the defendant was the only conclusion rationally and logically supported by that evidence." Langdon-Davies, 122 Vt. at 58, 163 A.2d at 875.
While I doubt that the Duty to Aid the Endangered Act will generate the flood of appeals the guest statute produced, I can't avoid the disquieting feeling that the real reason plaintiff will not be able to present his case to the jury is that this is the first case we have considered under the Act.
I dissent. I am authorized to state that Justice JOHNSON joins in this dissent.
NOTES
[*] One decision, Higgins v. Detroit Osteopathic Hosp., 154 Mich.App. 752, 398 N.W.2d 520, 524 (1986), contains little recitation of the relevant facts and is, therefore, difficult to evaluate.