**Nancy CLARKEN, Individually and as Executrix of the Estate of Matthew J. Clarken, Plaintiff,**

v.

**UNITED STATES of America, John Doe, Robert Roe and Martin Doe, (such names being fictitious), Defendants.**

Civ. A. No. 89–1841.

United States District Court,
D. New Jersey.

Feb. 19, 1991.

Kalman Harris Geist, Paterson, N.J., for plaintiff.

Michael Chertoff, U.S. Atty. by Daniel J. Gibbons, Asst. U.S. Atty., Newark, N.J., for defendants.

OPINION

BISSELL, District Judge.

This matter arises before the Court pursuant to the defendant's motion *in limine* to determine whether the plaintiff must prove gross negligence.

## I. FACTS AND BACKGROUND

Plaintiff Nancy Clarken seeks damages for the death of her husband allegedly as a result of the negligence of emergency medical technicians ("EMT's") employed by a government-owned hospital. It is presently scheduled for trial on January 14, 1992.

On March 1, 1987, Matthew Clarken suffered a cardiac arrest while a guest at the Thayer Hotel, located on the campus of the United States Military Academy at West Point, New York. The hotel staff notified Keller Army Community Hospital, and an ambulance was dispatched. The ambulance was staffed by two U.S. Army medics, Privates Carlos Smith and John Stratiff. Defendant alleges that these two medics have training equivalent to that of a New York State basic emergency medical technician.

Mr. Clarken was initially conscious when the medics arrived, but thereafter lost consciousness. He was eventually resuscitated at the Keller Army Hospital, but suffered severe brain damage causing him to remain in a vegetative state until his death on January 6, 1988. The plaintiff has offered six theories to support her claim of negligence:

1. Neither Stratiff nor Smith attempted to take a blood pressure reading after decedent became unconscious.

2. No cardio-pulmonary resuscitation ["CPR"] was begun until decedent was placed in the ambulance and only after it was ordered by a physician via radio communication between the ambulance

and the hospital—approximately six minutes after the need for it clearly was apparent.

3. Decedent vomited but there was no suctioning of the oral cavity nor any placement of any oral airway.

4. The medical personnel deviated from the acceptable standard of care with tragic consequences. These deviations included:

    a) Failure to take blood pressure;

    b) A failure to secure the airway by inserting an oral airway;

    c) A failure to provide supplemental oxygen in a timely manner;

    d) A failure to provide supplemental oxygen by the appropriate method, i.e., bag-valve-mask;

    e) A failure to initiate [CPR] in a timely fashion; and

    f) A failure to administer proper CPR.

5. Neither decedent's medical history nor the illness which he suffered on March 1, 1987, would have precluded Mr. Clarken from continuing his employment until retirement, had he been properly cared for on March 1, 1987.

6. Neither decedent nor plaintiff contributed to the injuries and losses herein by any improper action or failure to act.

(Pretrial Order at 5–6 (Plaintiff's Contested Allegations)).

The defendant presently moves for an order determining whether plaintiff has to prove gross negligence, rather than ordinary negligence, in order to recover. The basis of this request is defendant's position that under the Federal Tort Claims Act, courts apply the law of the place where the allegedly negligent act occurred, which is New York. Defendant further argues that under New York law, specifically, the Good Samaritan Law found at Section 3013 of the New York Public Health Law, plaintiff cannot recover against voluntary ambulance personnel unless she proves gross negligence.

■ The plaintiff concedes that New York law applies to this action. However, plaintiff argues that the defendants are not "voluntary ambulance personnel" because they were under a preexisting duty to render emergency service and are therefore not within New York's Good Samaritan Law.

## II. DISCUSSION

### A. *The Parties' Arguments*

Section 3013 of the New York Public Health Law provides, in relevant part:

1. Notwithstanding any inconsistent provision of any general, special or local law, a voluntary ambulance service described in subdivision three of section three thousand one of this article and any member thereof who is an emergency medical technician or an advanced emergency medical technician and who voluntarily and without the expectation of monetary compensation renders medical assistance in an emergency to a person who is unconscious, ill or injured shall not be liable for damages for the death of such person alleged to have occurred by reason of an act or omission in the rendering of such medical assistance in an emergency unless it is established that such injuries were or such death was caused by gross negligence on the part of such emergency medical technician or advanced emergency medical technician.

\*    \*    \*    \*    \*    \*

4. A certified emergency medical technician or advanced emergency medical technician, whether or not he is acting on behalf of an ambulance service, who voluntarily and without the expectation of monetary compensation renders medical assistance in an emergency to a person who is unconscious, ill or injured shall not be liable for damages alleged to have been sustained by such person or for damages for the death of such person alleged to have occurred by reason of an act or omission in the rendering of such medical assistance in an emergency unless it is established that such injuries were or such death was caused by gross negligence on the part of such emergency medical technician or advanced emergency medical technician.

(Public Health Law, § 3013(1)). The relevant definitions are as follows:

3. "Voluntary ambulance service" means an ambulance service (i) operating not for pecuniary profit or financial gain, and (ii) no part of the assets or income of which is distributable to, or enures to the benefit of, its members, directors or officers except to the extent permitted under this article.

\* \* \* \* \* \*

6. "Emergency medical technician" means an individual who meets the minimum requirements established by regulations pursuant to section three thousand two and who is responsible for administration or supervision of initial emergency medical assistance and handling and transportation of sick, disabled or injured persons.

(Public Health Law, § 3001(3), (6)).

The United States argues that these provisions shield the medics from liability except to the extent that plaintiff proves gross, rather than ordinary, negligence. The medics were on duty for the Army, and received Army pay. (Defendant's Br. at 4). The medics were actually hospital orderlies, who manned ambulances whenever use of the ambulance was necessary. (*Id.* at 1). The U.S. Army did not charge the plaintiff for emergency medical services, does not earn a profit from such services, and does not offer such services to the public in general except on an emergency basis. (*Id.* at 4). "None of the assets or revenue of Army medical facilities enures to the benefit of any of the U.S. Army's personnel." (*Id.*)

In addition, the United States argues that the fact that the medics receive ordinary Army salary does not take this ambulance service out of the Good Samaritan Law. (*Id.* at 7–8). In particular, "[t]hey are paid for fulfilling various medical functions within the military medical service, principally those of hospital orderlies, and only incidentally do they provide emergency ambulance service to civilians." (*Id.* at 8). Finally, the United States argues that the policy underlying the Good Samaritan Law would be served by protecting these defendants from liability for ordinary negligence:

The Army's medical services are provided for the military community at West Point, and are not offered to the general public. Defendant is protected from liability when providing medical services to military personnel. *Ferres v. United States,* 340 U.S. 135, 146 [71 S.Ct. 153, 159, 95 L.Ed. 152] (1950). The military has no duty to care for civilians who become ill while visiting military facilities. *See Adamowicz v. Claridge Hotel,* 135 A.D.2d 769, 522 N.Y.S.2d 884 (N.Y.App.Div., 2d Dept.1987) (casino guest who suffered heart attack alleged negligence by casino-employed EMT's; held no duty at common law to render aid to a sick guest, therefore casino protected by New Jersey Good Samaritan law); *Clark v. State,* 195 Misc. 581, 590, 89 N.Y.S.2d 123 [132] (N.Y.Ct.Claims 1949) (state has no duty to render aid under New York law); *Bunting v. United States,* 662 F.Supp. 971 (D.Alaska 1988 [1987]) [*aff'd,* 884 F.2d 1143 (9th Cir.1998 [1989])] (Coast Guard, in providing medical aid to civilian airman rescued from sea, is comparable to a private company with helicopter service and private clinic for its employees, and has no duty to rescue the civilian or provide care), *aff'd,* 884 F.2d 1143 (9th Cir.1989). The purpose of New York's Good Samaritan Law is to encourage volunteers to provide emergency medical services for the public's benefit. If defendant is to be encouraged to open its facilities to civilians defendant should be protected in the same manner as any other community's voluntary service is protected.

(*Id.* at 8–9). Thus, the United States argues that the plaintiff must prove gross negligence, rather than ordinary negligence, in order to recover.

In opposition, the plaintiff argues that the Good Samaritan Law does not protect these medics because the statute does not protect those who have a pre-existing duty to act. (Plaintiff's Br. at 6). Plaintiff argues that "[i]t was in the normal course of the duties of Specialists Stratiff and Smith

to render emergency assistance to individuals injured or ill within the jurisdiction of Keller Army Hospital." (*Id.* at 8).

Plaintiff relies on several cases in support of her position that an EMT with a pre-existing duty to act is not within the Good Samaritan statute. First, plaintiff contends that the present matter is not within the intent of the legislature in enacting the Good Samaritan statute, relying on *Rodriguez v. New York City Health and Hospital Corporation*, 132 Misc.2d 705, 505 N.Y.S.2d 345 (N.Y.Sup.Ct.1986). In *Rodriguez*, plaintiff brought suit against the treating hospital and a doctor for the death of her husband. The doctor moved for summary judgment on the basis that he never treated the deceased and that there was never any doctor-patient relationship between them. (*Id.* 505 N.Y.S.2d at 346). The court granted the motion on the basis of the Good Samaritan statute, since the record revealed that the doctor lived in the same building in which the deceased was the superintendent. (*Id.* at 347). On the night in which the decedent took ill, the doctor was entering the building when the decedent's wife asked for his aid. (*Id.*) The doctor took the decedent's pulse and heart rate and called the police in order to have an ambulance come and take him to the hospital. (*Id.*) Thus, the Court concluded that the doctor's conduct was within the Good Samaritan statute and therefore could be liable only if the plaintiff proved gross negligence. (*Id.*) Since there was no evidence of gross negligence, the court granted the motion. (*Id.*)

Plaintiff herein distinguishes *Rodriguez* on the basis that Stratiff and Smith had a pre-existing duty to render aid, and did not act voluntarily but were under an obligation to perform that duty. (Plaintiff's Br. at 5–6). In further support of her position, plaintiff relies on various out-of-state cases which recognize that the Good Samaritan statute does not protect those who are under a pre-existing duty to act. One such case is *Henry v. Barfield*, 186 Ga.App. 423, 367 S.E.2d 289 (1988), in which the Georgia court described Georgia's Good Samaritan statute:

[T]he basic premise of the statute is "to induce voluntary rescue by removing fear of potential liability which acts as an impediment to such rescue. Thus, they are directed at persons who are not under some pre-existing duty to rescue. If the doctor had a particular employment duty to aid the patient at the hospital or had a pre-existing doctor-patient relationship to the patient he aided, then he had a duty to the patient to begin with; and in such case he does not need a special inducement to offer aid, the aid he offers is not 'voluntary' in the sense of a Good Samaritan, and public policy would be ill-served if he were relieved of the usual physician's duty of care and given immunity in such a case. Good Samaritan statutes are directed at persons, including physicians, who *by chance and on an irregular basis* come upon or are called upon to render emergency care. The fact that a physician is skilled in the subject matter in question or that the exigency lies within his expertise, does not create a duty where none existed before; in fact such persons are particularly encouraged by the statute to volunteer their aid. Neither is he deprived of immunity by the fact alone that he works at the hospital, or is present at the hospital, or is called to the hospital when the emergency arises. If there was no prior duty to respond and there was no prior doctor-patient relationship, one is not created by the event of the emergency. But clearly the occurrence of an emergency will not invoke the immunity, if it was the doctor's duty to respond to the emergency." *Clayton v. Kelly*, 183 Ga.App. 45, 47, 357 S.E.2d 865 (1987).

(*Id.* 367 S.E.2d at 290–91) (emphasis in original). Plaintiff herein relies on various other state court decisions, many of which will be described below.

## B. Analysis

This Court finds that these cases such as *Henry* are persuasive, even though the Good Samaritan statute may not be identical, on the question of pre-existing duty. This Court agrees that the policy to be served by enacting a Good Samaritan stat-

ute is to encourage the voluntary provision of services to those in need. (*See e.g. Rodriguez,* 505 N.Y.S.2d at 347–48) ("A physician who does no more than arrange, under emergency conditions, for a neighbor to be taken to a hospital, should not become and remain a defendant in a lawsuit."). Accordingly, the policy is not served where there exists a pre-existing duty to render aid. (*See e.g. Henry,* 367 S.E.2d at 290; *see also Lindsey v. Miami Development Corp.,* 689 S.W.2d 856, 860 (Tenn.1985) ("[A] Good Samaritan Act does not protect a defendant who had a pre-existing duty to render aid to the plaintiff [because such] statutes are directed toward persons who are not under some pre-existing duty to re[nder] aid.")).

■ This does not render the defense of the Good Samaritan statute invalid in the present matter, however. The question remains as to what sort of "pre-existing duties" remove the defendants from the protection of the statute. The plaintiff argues that so long as the medics owed a duty to someone, in this case, the Army, then their conduct is outside the protection of the statute. In this Court's view, however, the duty exempting the actors from statutory protection must flow to the injured. In other words, Stratiff and Smith cannot claim Good Samaritan protection if they owed a duty to Mr. Clarken to come to his aid.

In *Bunting v. United States,* 884 F.2d 1143 (9th Cir.1989), the Ninth Circuit was faced with the question of whether a Coast Guard helicopter crew and doctor were within the protections of Alaska's Good Samaritan statute. The court noted that under 28 U.S.C. § 2674, the United States is liable for Federal Tort Claims Act claims to the extent that private individuals are liable under the same circumstances. (*Id.* at 1145). The court began its analysis by asking, "[a]ssuming for the moment that the Coast Guard was not under a pre-existing duty to rescue, Duckworth's [the doctor] liability is the same as that of a private physician who rendered the same emergency services in any clinic in Alaska." (*Id.*) Thus, the court looked at Alaskan law,

particularly the Supreme Court decision in *Lee v. State,* 490 P.2d 1206 (Alaska 1971), *overruled on other grounds, Munro v. City Council,* 545 P.2d 165, 170 n. 11 (Alaska 1976), *overruled on other grounds, LaMoureaux v. Totem Ocean Trailer Express, Inc.,* 651 P.2d 839, 840 n. 1 (Alaska 1982). In *Lee,* an Alaska state trooper rescued a young girl who had been grabbed by a lioness at an amusement park. The trooper shot the lioness, and then his gun discharged again, hitting the girl in the leg. The court held that the trooper did not have the protection of the Good Samaritan statute because he was under a duty, as a general law enforcement officer, to rescue the child. (*Bunting,* 884 F.2d at 1145).

The plaintiff in *Bunting* argued that the Coast Guard was analogous to the state trooper in *Lee,* since both are under a duty to rescue individuals in emergency situations. (*Id.*) The Ninth Circuit stated that such reliance upon *Lee* was misplaced because the Good Samaritan statute had been amended in Alaska, changing the qualifying actor from "a person who, without expecting compensation, renders care" to "a person at a hospital or any other location, who renders emergency care." (*Id.* at 1146). Thus, the Alaskan statute provided protection to individuals who receive compensation for emergency care rendered at hospitals. (*Id.*) The policy behind broadening the protection of the statute was to encourage the creation and maintenance of emergency medical facilities. (*Id.*) Thus, the Ninth Circuit held that a private physician in Duckworth's position would be within the protection of the Good Samaritan statute. (*Id.*)

The next question for the *Bunting* court was whether the Coast Guard had a pre-existing duty to rescue, placing it beyond the protection of the Good Samaritan statute. (*Id.*) Under 14 U.S.C. § 1 *et seq.*, the Coast Guard is under a duty to operate rescue facilities. (*Id.,* citing 14 U.S.C. § 2). The Coast Guard is also authorized to perform any and all acts necessary to those needing aid on the seas. (*Id.* at 1146–47 (citing 14 U.S.C. § 88)). However, the statute did not pose a duty on the Coast Guard

to rescue, and therefore it is protected by the Good Samaritan statute. (*Id.*)

The *Bunting* court's analysis is particularly persuasive in the present matter. The question for the Ninth Circuit was not whether the Coast Guard physician was under *some* duty to act (he was, as he was required to act by the Coast Guard on behalf of the Coast Guard), but whether he was under a pre-existing duty to render aid to the plaintiff. Otherwise, the statute's purposes are not served.

Similarly, in *Henry*, quoted above, the court referred to "a particular employment duty to aid the patient at the hospital" and a doctor-patient relationship obligation. 367 S.E.2d at 290. This language suggests that only where the employer is obligated to the injured, and the actor is obligated to the employer, does a duty to the injured arise between the actor and the injured. Indeed, both of these duties go to the actor's obligation to the injured party, not the actor's obligation to his employer or some other person.

Other cases have considered the question of whether an actor owes a pre-existing duty to the injured such that a Good Samaritan statute is not applicable. *See e.g. Flynn v. United States*, 902 F.2d 1524 (10th Cir.1990) (National Park Service officers do not have a pre-existing duty, either statutory or otherwise, to render assistance outside the confines of the National Park System (despite the fact they were EMT's and were paid salaries by the Service) and therefore are within the protection of the statute); *Tatum v. Gigliotti*, 80 Md.App. 559, 565 A.2d 354 (1989), *aff'd*, 318 Md. 639, 569 A.2d 705 (Md.1991) (paramedics employed by the county fire department were protected by the Good Samaritan statute, providing protection for EMT's, since they were not under a pre-existing duty to rescue, despite the fact that they received a salary from the fire department since statute went to question of compensation paid by injured).

Nancy Clarken's reliance upon *James v. Rowe*, 674 F.Supp. 332 (D.Kan.1987), is misplaced. In *James*, the court considered the liability of two ambulance attendants for acts occurring after they were called to render assistance at an accident. The original portion of the Kansas Good Samaritan Law was very broad, providing immunity for any health care provider rendering emergency care at the scene. (*Id.* at 332). Additional provisions, however, include one which abrogates the ambulance attendant's ordinary negligence when he or she is acting at the instruction of a doctor or nurse. (*Id.* at 333). Thus, the court concluded that the law was not so broad as the original language suggests. Furthermore, in determining that the defendant ambulance attendants were not covered by the Good Samaritan statute, the court considered the policy of "increas[ing] the chances of an accident victim receiving care." (*Id.*)

Of particular importance to the plaintiff herein is the court's statement concerning its review of other states' Good Samaritan statutes:

> [T]hose states which have interpreted similar laws have uniformly held that the law is not meant to exempt all medical personnel in every emergency situation, but only those personnel who happen across an emergency outside the normal course of their work and who otherwise have no duty to assist.

(*Id.* at 333–34) (citations omitted). Plaintiff Clarken herein relies on this statement in support of her position that the present matter is distinguishable from the scenario meant to be addressed by the statute, namely, the accident victim who receives aid from a passer-by. (*See* Plaintiff's Br. at 8–9).

New York's Good Samaritan statute is far more broad than that at issue in *James*. As the quoted provisions reveal, New York's statute is specifically designed to address the negligence of voluntary ambulance services and EMT's employed thereby. The ordinary factual scenario addressed by the statute is that of a community which is served by an all-volunteer ambulance service, which is run not-for-profit. Where such services exist, the legislature sought to limit their liability in order that existing services, manned by volunteers, might survive in the face of

increasing amounts of litigation. In addition, the Good Samaritan statute also encourages the creation of voluntary services by eliminating a major cost of such services.

In this Court's view, the present situation is within the Good Samaritan statute of New York. The military is under no duty to provide emergency relief to civilians present on its premises, but does so voluntarily. The fact that the medics owe a duty to the military to perform the tasks assigned to them, for which they are compensated by the military, (but not the recipient of their EMT services) does not take their conduct here outside of the protection of the Good Samaritan statute. The EMT's and ambulance operating out of the Keller Army Community Hospital are the virtual equivalent of the volunteer ambulance unit and its trained members, particularly when answering this call to help a civilian occupant of a hotel on post.

The plaintiff has been unable to provide the Court with anything suggesting that the military owed such a duty to her or her decedent as would take this case outside of either the letter of the New York Good Samaritan Law or the underlying policies upon which it is based.

Furthermore, the fact that plaintiff received a bill of $882.00 from the hospital does not remove this matter from the statute's protection. Plaintiff does not assert that any portion of that bill was attributed to the emergency services performed prior to arrival at the hospital. Even if there were such an amount so allocated, there is no assertion from plaintiff that such an amount would be "profit," "financial gain," or "monetary compensation" rather than reimbursed expenses.

### III. CONCLUSION

For the reasons set forth above, defendant's motion *in limine* for an order declaring that the plaintiff must prove gross negligence in order to recover is granted.