# David N. Hardingham v. United Counseling Service of Bennington, et al.

[667 A.2d 289]

No. 94-096

Present: **Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed September 1, 1995

*John D. Shullenberger* of *Mickenberg, Dunn, Sirotkin & Dorsch,* Burlington, for Plaintiff-Appellant.

*Stephen G. Norten* and *John G. Beiswenger* of *Paul, Frank & Collins, Inc.,* Burlington, for Defendants-Appellees United Counseling Service, Halpin, O'Brien and Gordon.

*Pietro J. Lynn* of *Dinse, Erdmann & Clapp,* Burlington, for Defendant-Appellee Kowalski.

**Gibson, J.** Plaintiff David Hardingham, who was blinded as the result of drinking windshield wiper fluid during an alcoholic binge, appeals the superior court's orders granting summary judgment in favor of defendants, whom plaintiff accused of negligently assisting him while he was intoxicated. We resolve all issues raised on appeal except for the issue of whether the superior court erred in ruling that, as a matter of law, defendants' conduct did not amount to gross negligence. The four-member panel is equally divided on that issue, and it must be reargued before a full court.

## I.

In January 1991, plaintiff filed a complaint against (1) the United Counseling Service (UCS), a private, nonprofit charitable organization providing counseling and psychiatric treatment to persons with mental illness, mental retardation, or substance-abuse problems; (2) John Halpin, UCS's executive director; (3) Donald Kowalski, a psychiatrist and UCS's medical director; (4) David O'Brien, UCS's director of outpatient services; and (5) Larry Gordon, UCS's coordinator of emergency services. The complaint arose from the following facts, which are either undisputed or viewed most favorably to plaintiff.

In November 1987, UCS employed plaintiff as an emergency services counselor. UCS knew that plaintiff was a recovering alcoholic, but plaintiff had never been a client of UCS or any of its employees. On February 3, 1988, Halpin became aware that plaintiff was drinking again. After failing to persuade plaintiff to seek psychological and medical attention, Halpin asked Gordon to visit plaintiff. Gordon went to plaintiff's apartment on February 4 and found him in an inebriated condition. When plaintiff refused to seek treatment, Gordon called plaintiff's estranged wife, the emergency room at Southwestern Vermont Medical Center (SVMC), the police, and the Bennington Rescue Squad, but nobody was willing to take any action without plaintiff's cooperation. Gordon left plaintiff's apartment and took all the alcohol he could find. The next day, plaintiff was suspended from his job because of his condition; that same day, plaintiff told O'Brien during a telephone conversation that he would enter a treatment program.

On February 11, Halpin went to plaintiff's apartment and discovered plaintiff in an inebriated, semi-conscious state. Halpin returned to UCS and informed Gordon, O'Brien and Kowalski of plaintiff's condition. The three men went to plaintiff's apartment and found it in

disarray. While the men were at the apartment, plaintiff got up, went to a sink, and began to drink from an apparently full container of windshield wiper fluid. O'Brien and Kowalski took the container away from plaintiff, and Gordon called the police. Notwithstanding plaintiff's vehement protests, the three men took him outside and helped police place him in the back of a patrol car. The police took plaintiff to the SVMC emergency room. Kowalski rode with plaintiff in the patrol car, but did not go into the hospital; instead, Gordon and O'Brien accompanied plaintiff to the emergency room.

At the emergency room, plaintiff refused to take a blood test despite Gordon's request that he do so. When plaintiff would not agree to go to a residential treatment program, Gordon signed an incapacitation order, and plaintiff was taken to the Rutland Regional Correctional Center. At no time did any of the three men inform police, emergency room personnel, or corrections employees that plaintiff had ingested, or had attempted to ingest, a bluish liquid that may have been windshield wiper fluid. The following morning, plaintiff was admitted to the Rutland Medical Center and placed in the intensive care unit. Tests revealed the presence of methyl alcohol in plaintiff's blood in sufficient concentration to present a threat to his life. As a result of the methanol overdose, plaintiff suffered severe health problems, including blindness.

In his complaint, plaintiff alleged that defendants were negligent in failing to inform medical authorities that he had ingested windshield wiper fluid. He also alleged that the Rutland Community Correctional Center and one of its security officers were grossly negligent in failing to provide him with timely medical attention, thereby violating his rights under the Eighth and Fourteenth Amendments to the United States Constitution. The correction-center defendants had the case removed to federal district court, where plaintiff sought to compel Kowalski to turn over notes he had taken during the events that led to the lawsuit. The federal court denied plaintiff's motion to compel, ruling that Kowalski's notes were taken as the result of plaintiff's repeated threats to sue those trying to help him, and thus were prepared in anticipation of litigation.

Eventually, the UCS defendants moved for summary judgment, and the correction-center defendants moved for dismissal, asserting that the claims against them were barred by the Eleventh Amendment. The district court granted the motion to dismiss, but declined to rule on the motion for summary judgment. Instead, the court remanded the case to Chittenden Superior Court because all claims

over which there was original federal jurisdiction were dismissed, and the remaining claims against the UCS defendants raised novel questions concerning Vermont statutory law.

In January 1993, defendants sought summary judgment. The superior court granted their motions based on its conclusion that, as a matter of law given the facts of the case, (1) Vermont's Duty to Aid the Endangered Act, 12 V.S.A. § 519, immunized defendants from civil liability for acts of ordinary negligence, and (2) defendants' actions were not grossly negligent. On appeal, plaintiff argues that (1) the court erred by granting summary judgment to all defendants and to UCS in particular, and (2) Kowalski should have been required to produce his notes of the events at issue in the case.

## II.

■ Plaintiff first argues that the superior court improperly concluded, as a matter of law, that defendants were entitled to the protections of the Duty to Aid the Endangered Act, 12 V.S.A. § 519. The Act provides as follows:

### § 519. Emergency medical care

(a) A person who knows that another is exposed to grave physical harm shall, to the extent that the same can be rendered without danger or peril to himself or without interference with important duties owed to others, give reasonable assistance to the exposed person unless that assistance or care is being provided by others.

(b) A person who provides reasonable assistance in compliance with subsection (a) of this section shall not be liable in civil damages unless his acts constitute gross negligence or unless he will receive or expects to receive remuneration. Nothing contained in this subsection shall alter existing law with respect to tort liability of a practitioner of the healing arts for acts committed in the ordinary course of his practice.

(c) A person who willfully violates subsection (a) of this section shall be fined not more than $100.00.

### A.

Plaintiff contends that summary judgment is inappropriate because the existence of the following factual statutory prerequisites

are in dispute and must be resolved by the fact finder before the trial court can determine if the Act applies: (1) that an emergency existed, (2) that defendants provided "reasonable assistance," and (3) that defendants neither received remuneration for their actions nor were practitioners of the healing arts acting in the ordinary course of their practice.

Regarding the first point, plaintiff contends that defendants knew of his deteriorating condition for some time, and thus there was no "suddenness or randomness" to the situation that led to defendants' actions. Assuming these facts are true, they do not preclude application of the Act. The Act applies if the rescuer knows that another is exposed to "grave physical harm." There can be no dispute that the individual defendants knew plaintiff was in grave physical danger. Although plaintiff's condition on February 11 may not have been the result of a single, traumatic event, defendants felt compelled at that point to act to save plaintiff from serious harm. See *Jackson v. Mercy Health Center, Inc.*, 864 P.2d 839, 845 (Okla. 1993) (keeping in mind Good Samaritan statute's purpose to encourage medical providers to intervene, term "emergency" must be construed broadly; emergency occurs whenever person appears to be ill or in need of succor); cf. *Villamil v. Benages*, 628 N.E.2d 568, 575 (Ill. App. Ct. 1993) (affirming summary judgment for defendant doctor in case where trial court found no triable issue of fact as to whether emergency existed for purposes of Good Samaritan statute when doctor, visiting another patient at hospital, was called in to deliver premature infant).

Regarding the second point, we construe the term "reasonable assistance" to refer only to the extent of the rescuer's effort to comply with the statutory duty to render aid, not to the adequacy of the aid actually rendered. A person who willfully fails to make a reasonable effort to provide assistance is subject to a $100 fine, 12 V.S.A. § 519(c), but is not subject to civil liability unless the person's actions are grossly negligent or unless the person receives or expects to receive remuneration. Any other interpretation would render the statute internally inconsistent and would thwart the statute's primary purpose — to encourage rescuers to provide assistance by protecting them from civil liability for ordinary negligence. See Franklin, *Vermont Requires Rescue: A Comment*, 25 Stan. L. Rev. 51, 57 n.43 (1972) (by immunizing rescuers from civil liability for ordinary negligence as long as "reasonable assistance" is provided, § 519(b) would be internally contradictory unless "reasonable" relates to effort to comply with duty to aid rather than to adequacy of aid);

*Mallory v. City of Detroit,* 449 N.W.2d 115, 117 (Mich. Ct. App. 1989) (plaintiffs' allegations that emergency medics were negligent in failing to administer timely and appropriate medical treatment were not sufficient to render Good Samaritan statute inapplicable, given that statute protected such persons from liability absent showing that they were grossly negligent).

■ Here, defendants' efforts to assist plaintiff were more than reasonable. Defendants made repeated visits to plaintiff's apartment; they made multiple calls to plaintiff's wife and to emergency rooms and physicians; they sought the help of the police and the emergency rescue squad; they physically removed plaintiff from his home, despite his resistance, so that police would assist them; and they accompanied plaintiff to the hospital emergency room and encouraged him to consent to treatment. As the trial court noted, these acts probably saved plaintiff's life. Viewing the facts most favorably to plaintiff, no reasonable person could conclude that defendants failed to make reasonable efforts to assist him.

■ Regarding the third point, the individual defendants did not receive remuneration for assisting plaintiff, within the meaning of § 519, merely because they were paid their regular salary during the period they helped him. Cf. *Clarken v. United States,* 791 F. Supp. 1029, 1035 (D.N.J. 1991) (conduct of military medics is not taken outside protection of Good Samaritan statute merely because they were compensated for their services by military, as opposed to recipient of services); *Tatum v. Gigliotti,* 565 A.2d 354, 358 (Md. Ct. Spec. App. 1989) (salaried emergency medical technician does not receive "compensation" within meaning of Good Samaritan statute unless he charges victim for services rendered).

■ Nor can plaintiff successfully argue that, in assisting him, defendants acted in the ordinary course of their practice. Assuming that defendants are practitioners of the "healing arts," they did not act in the ordinary course of their practice when they entered a co-worker's apartment and delivered him against his will to the police, the emergency room, and eventually the correctional center. There is no evidence of any import that plaintiff was a client of UCS or any of the individual defendants. Rather than a client-therapist relationship, this case concerns friends trying to help a fellow co-worker in time of trouble. Defendants cannot be deprived of the protection of the Act merely because they had some expertise in matters relating to plaintiff's problems; indeed, the Act was intended in particular to

encourage medical personnel to provide aid for endangered persons. See Note, *Duty to Aid the Endangered Act: The Impact and Potential of the Vermont Approach*, 7 Vt. L. Rev. 143, 145, 154–56 (1982) (§ 519 arose principally out of Legislature's concerns that medical personnel were reluctant, because of fear of litigation, to help those in need when no duty to help existed); Franklin, *supra*, 25 Stan. L. Rev. at 52 n.13 (primary motivation behind Vermont's Good Samaritan law was concern that physicians' fears of malpractice suits were causing them to drive past accident scenes rather than stop and render assistance); *Clayton v. Kelly*, 357 S.E.2d 865, 868 (Ga. Ct. App. 1987) (Good Samaritan statutes are directed at persons, particularly physicians, who by chance and on irregular basis, are called upon to render emergency aid; fact that physician is skilled in subject matter in question, or that exigency lies within physician's expertise, does not exempt physician from protection of statute by creating duty where none existed before); *Gordin v. William Beaumont Hosp.*, 447 N.W.2d 793, 796 (Mich. Ct. App. 1989) (off-duty physicians are entitled to partial immunity under Good Samaritan statute; otherwise, they would be discouraged from responding to emergency situations). In short, defendants' acts of assistance in this case fall squarely within the Duty to Aid the Endangered Act.

As noted above, the four-member panel has divided equally on the issue of whether the superior court erred in determining that, as a matter of law, defendants' actions were not grossly negligent. Accordingly, this issue is not resolved by the current mandate and therefore must be reargued before a full court.

## B.

■ Plaintiff also argues that, even if the individual defendants are protected by § 519, UCS is not entitled to derivative immunity under the statute. We conclude that, as with the individual defendants, UCS is entitled to summary judgment because the Act applies to organizations as well as individuals and no preexisting clinical relationship existed between UCS and plaintiff. The Act applies to any "person." 12 V.S.A. § 519. For the purpose of construing statutes, the Legislature has defined "person" to "include any natural person, corporation, municipality, the state of Vermont or any department, agency or subdivision of the state, and any partnership, unincorporated association or other legal entity." 1 V.S.A. § 128. This definition applies "unless such construction is inconsistent with the manifest intent of the general assembly or repugnant to the context of the same

statute." 1 V.S.A. § 101. The broad definition of "person" set forth in § 128 is completely consistent with § 519's legislative purpose of encouraging persons, including medical personnel working for hospitals and other organizations, to assist those in danger.

As noted, the undisputed facts establish that UCS had no clinic-client relationship with plaintiff. Therefore, because § 519 is otherwise applicable, UCS is entitled to partial immunity under the Act, and summary judgment is appropriate. See *Jackson*, 864 P.2d at 842, 845 (where no preexisting relationship was established between hospital and plaintiff, hospital was clearly within protection of Good Samaritan statute, and had complete defense against ordinary negligence claims); cf. *Hamburger v. Henry Ford Hosp.*, 284 N.W.2d 155, 159 (Mich Ct. App. 1979) (hospital not entitled to immunity under Good Samaritan law for ordinary negligence, regardless of immunity of negligent employees, because hospital-patient relationship existed at time of negligent act).

### III.

Finally, plaintiff argues that Kowalski should have been required to produce the notes he took during plaintiff's rescue. As plaintiff concedes, he is asking us to reverse the ruling of the federal district court. Apart from jurisdictional considerations, we decline to consider the issue. Plaintiff neither renewed his motion to compel before the superior court nor even asked the court to consider the effect of the federal district court's ruling on his motion. Further, plaintiff never sought additional discovery under V.R.C.P. 56(f). Rather, plaintiff agreed that the case was ripe for decision on the summary judgment motions already filed in federal court. Under these circumstances, the issue is not properly preserved for consideration by this Court. See *Fitzgerald v. Congleton*, 155 Vt. 283, 295, 583 A.2d 595, 602 (1990) (issues not raised before trial court by party opposed to summary judgment were not properly preserved for review and would not be considered on appeal from grant of summary judgment).

*Affirmed on all issues except whether the jury could find defendants were grossly negligent, which shall be reargued before the full Court in the first regular term following the September Term.*