Kennery v. State, No. 40-1-08 Wmcv (Wesley, J., Oct. 26, 2010)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

**SUPERIOR COURT**                                    CIVIL DIVISION
**Windham Unit**                                      **Docket No. 40-1-08 Wmcv**


**Andrew V. Kennery,**
**Administrator of the Estate**
**Of Gladys M. Kennery,**
     **Plaintiff**


     **v.**

**State of Vermont, Travis L. Valcourt,**
**Francis J. LaBombard, III and other**
**Unknown Members of the Vermont**
**Department of Public Safety**
     **Defendants**


## ORDER GRANTING DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

Defendants have moved for summary judgment as a matter of law on all three counts in Plaintiff's complaint — negligence, gross negligence, and civil rights violations — against the State of Vermont and Troopers Travis L. Valcourt and Francis J. LaBombard, III. The lawsuit stems from a welfare check the Troopers performed on Plaintiff 's decedent, Gladys Kennery. The Troopers responded to a request made by Gladys' daughter, Lorraine, to check on the status of her elderly mother. Despite Lorraine's specific instructions on how to locate and identify the home, the Troopers arrived at and searched a home that was not Gladys' residence. In fact, Gladys had collapsed in her backyard on the way from her vehicle to her house, and was unable to get back up or pull herself into the shelter of her home. She remained outside until the following morning, and died twelve days later from injuries sustained that night.

Gladys' estate commenced this suit against the State of Vermont and the Troopers individually seeking compensatory and punitive damages for the injuries suffered by Gladys prior to her death, and for medical and funeral expenses. For the following reasons, the Court concludes that the State owed no special duty to Gladys, thus defeating the causes of actions based on negligence and gross negligence, and that the Defendants did not violate Gladys' civil rights. Accordingly, the Court grants Defendant's Motion for Summary Judgment.

*Standard*

In order to prevail on a motion for summary judgment, the moving party must show that there is no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law. V.R.C.P. 56(c)(3). "[T]he party opposing summary judgment is entitled to the benefit of all

reasonable doubts and inferences." *Carr v. Peerless Ins. Co.,* 168 Vt. 465, 476 (1998). In order to rule as a matter of law, the Court must accept as true Plaintiff's allegations made in opposition to Defendants' motion for summary judgment. *Sabia v. State*, 164 Vt. 293, 297 (1995). Nonetheless, a party seeking or opposing summary judgment may not rely on mere allegations in the pleadings but must set forth specific facts supported by affidavits or other appropriate evidence. V.R.C.P. 56(c), (e).

*Facts*

Gladys Kennery, an elderly woman who lived alone in her home in Marlboro, Vermont, visited a doctor on the evening of March 15, 2007. Gladys' daughter, Lorraine, who lives in White Plains, New York, expected to receive a call from her mother confirming Gladys' arrival home. After not receiving any contact from Gladys, Lorraine called the Vermont Department of Public Safety (VDPS) – known in the community as the Vermont State Police - and requested a welfare check on Gladys. Lorraine informed VDPS that Gladys had been ill and that she might have had trouble negotiating the pathway from her vehicle to her home, considering a recent fall outside her home. Lorraine gave VDPS explicit directions to Gladys' home on [street number redacted] Auger Hole Road. Lorraine explained that the mailbox for the house was directly across the road from the driveway, that the driveway to the house was on the right side of the road traveling north from Route 9, and that the house was visible from the road. She also informed VDPS of the location of a spare key to the home and granted VDPS permission to use the key to check on Gladys' condition.

Approximately 4 to 5 hours after Lorraine's initial contact with VDPS, Troopers Valcourt and LaBombard responded to the call. After receiving the assignment, Valcourt telephoned Lorraine and spoke with her for approximately 5 to 10 minutes. During the phone call, Lorraine gave Valcourt specific directions to the house, informed Valcourt about the spare key, and told him that her mother had previously fallen. Trooper Valcourt drove up a long driveway on the left side of the road, while Trooper LaBombard continued on Auger Hole Road. LaBombard eventually came upon a mailbox on the left side of the road with Kennery's housenumber ([street number redacted]) on it, and pulled into the driveway adjacent to the mailbox. Having returned to Auger Hole Road, Valcourt saw LaBombard's vehicle and also pulled into the driveway. Despite the information Lorraine gave VDPS and then to Valcourt, the Troopers proceeded to investigate premises associated with the wrong house. Gladys' house was actually directly across the road from the premises where the Troopers searched.

Believing that they were at the right home, the Troopers knocked on doors and looked through windows, walked around and scanned the perimeter of the house, and checked inside the garage. There was no one inside the house, nor any visible footprints in the snow around the home. The house did not have a house number on it, nor were there any vehicles parked anywhere on the property. As events proved, the house did not match the description Lorraine had given, nor did the Troopers recover a spare key. After searching the location for upwards of 20 minutes, Valcourt called the dispatcher and requested that Lorraine be informed of the Troopers' findings. Valcourt also put out a "be on the lookout" bulletin for Kennery and her vehicle via general broadcast, and requested the Brattleboro Police Department search the Brattleboro Memorial Hospital parking lot for Gladys' vehicle. Valcourt also personally

2

contacted Brattleboro Memorial Hospital and Grace Cottage Hospital to determine whether Kennery had been admitted to either facility. Valcourt then left a message for the day shift supervisor informing him of his findings and requested that the matter remain open so that a trooper from the next shift follow-up on the complaint.

As Lorraine suspected, Gladys had collapsed while walking from her car to her house after returning from her doctor's appointment. The next morning, a postal worker discovered Gladys lying on her back porch. The postal worker called for assistance and Gladys was taken by ambulance to Brattleboro Memorial Hospital. She died at the hospital twelve days later of complications from hypothermia suffered while lying outside overnight.

*Analysis*

The estate of Gladys Kennery has now brought suit against Defendants seeking damages for Gladys' injuries and death. Defendants have moved for summary judgment on all three of Plaintiff's claims. As discussed further below, the Court holds that Plaintiff has failed to show that the State owed a duty to Plaintiff, defeating Plaintiff's negligence and gross negligence causes of action; that even if a duty could be established, the evidence against the Troopers failed to depict the total absence of care required to support a claim of gross negligence; and that Plaintiff has not demonstrated a viable claim for a civil rights violation. Accordingly, summary judgment for Defendants must be granted as a matter of law.

*1. Plaintiff's Negligence Complaint Against the State*

Generally, lawsuits against the State are barred unless the State waives its sovereign immunity. *Kane v. Lamothe*, 2007 VT 91, ¶ 6, 182 Vt. 241. Through the Vermont Tort Claims Act, 12 V.S.A. § 5601, the State waives its immunity for injury to persons caused by the negligent act or omission of a state employee while acting within the scope of employment, subject to certain delineated exceptions. *Id*. Under 12 V.S.A.§ 5602, such actions may only be prosecuted against the State, and not directly against an employee, unless the injury was caused by gross negligence or willful misconduct. § 5602(b). The State will only be liable, however, "under the same circumstances, in the same manner and to the same extent as a private person would be liable to the claimant." 12 V.S.A. § 5601(a). Therefore, the waiver of § 5601(a) is limited to circumstances where there is a private analog for the theory of liability advanced by the plaintiff. *Kane*, 2007 VT 91, ¶ 6.

The private analog alleged by Plaintiff here is the common law tort of negligence. Plaintiff alleges that the Troopers' investigation was careless and rushed in that they ignored Lorraine's directions and her description of Gladys' house, and then conducted a cursory investigation of the incorrect house not matching Lorraine's description, which had its own mailbox with a different number. Plaintiff argues that the officers' failure to take a number of simple steps which would have revealed that they were at the wrong house amounts to gross negligence. To prove negligence, however, a plaintiff must show that the defendant owed her a legal duty, that the breach of that duty was a proximate cause of harm, and that she suffered actual damages. *Kane*, 2007 VT 91, ¶ 7. Thus, the first, and in this instance dispositive, question of law for the court is whether the State owed Plaintiff a duty of care under the circumstances present. *Id*.

3

Where the State is sued for negligence, considerations of sovereign immunity compel a distinction between the State's general responsibility to its citizens and any particular duty to one of them. In determining whether a governmental body has undertaken a specific duty of care towards a particular individual or group, as distinguished from its duty to the public at large, the court considers four factors: (1) whether an ordinance or statute sets forth mandatory acts for the protection of a particular class of persons; (2) whether the government has actual knowledge that particular persons within that class are in danger; (3) whether there has been reliance by those persons on the government's representations or conduct; and (4) whether the government's failure to use due care would increase the risk of harm beyond its present potential. *Sabia v. State,* 164 Vt. 293, 299 (1995).

As to the first factor, Plaintiff has not referenced any statutory language which sets forth specific standards guiding a police officer's acts when undertaking a welfare check for the protection of someone in Gladys' position. Plaintiff instead cites to various rules, guidelines and procedures of the VDPS. See Plaintiff's Statement of Undisputed Facts, ¶ 1 (rules and regulations specifically dealing with missing persons investigations), ¶ 2 (rules and regulations regarding dispatching services), ¶ 3 (practices and procedures to confirm the location of a residence during a welfare check), ¶ 4 (guidelines for dispatchers to use with respect to welfare checks). Whatever bearing these directives may have on the Department's expectations for the conduct of its officers, they do *not* create a duty to third parties. *Kane*, 2007 VT 91, ¶ 11 (emphasis added). Indeed, as the Supreme Court noted, the statutes governing the Vermont State Police "do not set forth *any* mandatory acts, much less mandatory acts for the protection of a particular class of persons." *Id*. at ¶ 10 (emphasis added).[1]

The issues here so closely resemble the Supreme Court's decision in *Kane* that this Court finds that opinion controlling on the issue of duty. *Kane v Lamothe*, 2007 VT 91. The *Kane* Court was also faced with the task of determining whether police officers owed a specific duty to an individual seeking assistance, different from the duty police officers owe to the public at large. In *Kane*, an officer responded to a domestic violence call. While at the scene, the officer interviewed the aggressor boyfriend in a separate room, and then interviewed the plaintiff, who had visible marks of abuse on her face, within earshot of the boyfriend. *Id*. at ¶ 3. The officer left the apartment without arresting the boyfriend or investigating further. Later the same evening, the boyfriend attacked and sexually assaulted the plaintiff, and again the following morning. *Id*. at ¶¶ 3-4. A week later, the boyfriend was arrested and later found guilty of domestic assault and sexual assault. He was sentenced to twenty to forty-five years in prison. *Id*.

After the plaintiff filed suit against the State and the officer for negligence and gross negligence respectively, the Supreme Court unanimously upheld the Superior Court's decision to dismiss the case. It concluded that the State owed no special duty to plaintiff that would support

---

[1] To be sure, one of the purposes of the Department of Public Safety, among others, is conducting searches for lost or missing persons. 20 V.S.A. §§ 1811, 1824. Yet, as with many other public safety functions assigned to the Department, the statutes impose no particular requirements for the discharge of this aspect of its mission. Absent any express statement of legislative intent, the Department can not be charged with any individualized duty to a particular missing person. *Id.*

a claim of negligence. *Id*. at ¶ 12. The Court held that although the State's law enforcement duties are provided for by statute, where those statutes do not set forth mandatory acts for the protection of a particular class of persons, they do not create any special duty when officers fail to take certain specific actions in the performance of law enforcement responsibilities. *Id*. at ¶ 9. The Court characterized the decision to arrest a suspected aggressor as discretionary, and concluded that the officers were under no duty to arrest the boyfriend under the circumstances presented. *Id*. As here, plaintiff in *Kane* invoked Vermont State Police Manuals claiming that they established a special duty owed to plaintiff, since the manuals set forth specific procedures for investigating a report of domestic violence. *Id*. at ¶ 10. However, the Court held that internal policies and manuals do not generally create legal requirements for which individuals may hold the State liable. *Id*. at ¶ 11. Such guidelines and procedures do not have the same authority as statutes and ordinances, making them insufficient to establish that the State owed any particular duty to a potential victim during a police investigation of a domestic violence complaint. *Id*., citing *Sabia*, 164 Vt. 293.

*Sabia v. State*, 164 Vt. 293 (1995), the case on which Plaintiff relies in arguing for the existence of a duty between the State and Gladys, is a far less recent case than *Kane*, and is distinguishable in several important ways from the matter at hand. In *Sabia*, the Supreme Court found that the Legislature had charged the State Department of Social and Rehabilitation Services (SRS) with a specific duty to protect child victims of sexual abuse. Clear statutory language mandated that SRS take specific actions during the course of a child abuse investigation. The breach of duty arose from the explicit failure to follow the statutory mandate. 164 Vt. at 299. Indeed, the Court found that the SRS employees *actually knew* that children were being sexually abused and were in danger, since they had been told of the abuse by the very children in question. *Id*. Additionally, the abused children relied on SRS's promises to intervene, and as a result, were deterred from seeking other avenues of relief, satisfying the detrimental reliance prong of the duty test. *Id*. Finally, the Court held that SRS's failure to act *increased* the risk of injury to the children by allowing the harm to continue, and by leading the perpetrator to believe that he could continue his abuse with impunity. *Id*. Thus, all four of the factors weighed heavily in favor of plaintiff, thereby establishing a special duty owed by the government to the plaintiff.

In contrast to *Sabia*, but akin to *Kane,* Plaintiff here can not identify any statutory language requiring specific acts to be taken by police officers when responding to a missing persons report or a request to conduct a welfare check. As stated, language in an internal manual or guideline is insufficient to establish a legal duty. Unlike the situation involving the child victims in *Sabia*, the Troopers here did not have actual knowledge that Gladys was in grave physical danger, only that she might possibly require some assistance based on her daughter's uncertainty.[2] Further, the facts supporting detrimental reliance and exacerbation of harm so prominent in *Sabia* are far less compelling here, particularly when compared with the analogous considerations in *Kane*. Whatever expectations Loraine might have had about the results of her request for a welfare check, there was no direct reliance by Gladys that compares to the direct

---

[2] Compare *Kane,* where the officer observed visible marks of abuse on the plaintiff's face during the course of his investigation, and then left the plaintiff alone with the apparent aggressor. 2007 VT 91, ¶ 9. Yet, the *Kane* Court omitted any discussion of this aspect of the *Sabia* analysis, concluding that the absence of clear statutory intent precluded any finding of duty notwithstanding the victim's apparent vulnerability.

5

complaints of abuse by the child victims in *Sabia*. Similarly, the correlation here between the claimed negligence and the exacerbation of likely harm suffered by Gladys remains indistinct in comparison with the clearly enhanced danger found compelling in *Sabia*. Again, *Kane* affords another important benchmark, since the Court discerned no duty there despite the domestic assault and rape which ensued after the alleged negligent failure to arrest. Following *Kane*, one must conclude that of the four factors cited by *Sabia*, the first one is clearly the most important, focusing on the existence of a specific duty recognized by statute.

Indeed, the *Sabia* Court held that there is a special relationship established between SRS and the children specifically identified to its care. 164 Vt. at 311. The statutory scheme "imposes a duty that demands special vigilance to assure that assistance will be provided to those who are helpless to protect themselves." *Id*. Thus, social policy considerations warranted imposition of liability on the party charged with duty to protect those who depend on that protection, not only to provide compensation to abused children but to encourage the protective agency to perform its duty diligently in the future. *Id*. at 312. No similar special relationship has been recognized with respect to the Department of Public Safety and members of the public at large who are reported as missing. In sum, the imposition of tort liability on the State for its failure to act in *Sabia* must be seen as a very limited and special case, inapplicable to the circumstances here.

*2. Plaintiff's Alternate Theories of a Source of Defendants' Duty*

Plaintiff argues for application of Vermont's so-called "Good Samaritan" statute as an alternate private analog to negligence. The statute requires that "[a] person who knows that another is exposed to grave physical harm shall ... give reasonable assistance to the exposed person ...." 12 V.S.A. § 519(a). The statute, however, is not applicable because the facts alleged do not support a finding that the Troopers *knew* that Plaintiff was exposed to grave physical harm. See *Kane*, 2007 VT 91, n.4 ("Good Samaritan" statute did not apply as facts alleged did not support finding that state trooper *knew* that plaintiff was exposed to grave physical harm despite responding to call that plaintiff was in danger from former boyfriend, observing visible signs of physical abuse on plaintiff's body, and leaving scene without arresting boyfriend who would go on to brutally attack plaintiff).[3]

Plaintiff proposes yet another analog to establish the duty it seeks to enforce, citing to Restatement (Second) of Torts § 324. § 324 imposes a duty of care upon those who take charge of helpless persons, even when they are not required to do so. Restatement (Second) of Torts § 324. The Supreme Court in *Sabia* made reference to § 324, noting that, given its statutory duty, SRS could hardly claim exemption from liability because it did not take charge of plaintiffs, or because its failure to act left plaintiffs in no worse position than they would have been had plaintiffs never sought its help. *Sabia*, 164 Vt. at 305. As previously explained, however, there was no statutory duty on the part of the Troopers here to render assistance to Gladys. Moreover,

---

[3] Furthermore, the duties imposed by the "Good Samaritan" statute are limited. See, *Hardingham v. United Counseling Service of Bennington*, 164 Vt. 158, 163-64 (1995) (duty created by statute held "to refer only to the extent of the rescuer's effort to comply with the statutory duty to render aid, not to the adequacy of the aid actually rendered").

the Troopers can hardly be said to have taken her into their charge. Indeed, the Troopers were responding to a request for a welfare check based on the possibility that Gladys was missing. They had no information implicating any existing injury, much less knowledge of an injured person within the immediate scope of their attention. In contrast, defendants in *Sabia* actually acknowledged the immediacy of the peril to the children, and gave assurances that they would either remove plaintiff from the abusive home, or insure that the abuser was removed. *Id*. at 299. Under the facts here, § 324 does not further inform the analysis supporting Plaintiff's claim as to the nature of Defendants' duty.

*3. Plaintiff's Gross Negligence Complaints Against the Individual Trooper Defendants*

The Court next considers Plaintiff's claim of gross negligence against Troopers Valcourt and LaBombard, which is plead in an effort to satisfy 12 V.S.A.§ 5602(b). The identical logic undercutting Plaintiff's claim that the State is responsible for the Troopers negligence applies similarly to defeat the allegation that they were grossly negligent. Because this Court holds that Plaintiff has been unable to establish a specific duty owed by the VDPS to Plaintiff, Plaintiff's claims against the individual Troopers likewise cannot satisfy the more exacting elements for an action in gross negligence, which is necessary to the imposition of individual liability. *Powers v. OCS*, 173 Vt. 390, 398 (2002). Thus, summary judgment must also be granted in favor of Defendants as to the gross negligence claims against Troopers Valcourt and LaBombard.[4]

*4. Plaintiff's Claims of Civil Rights Violations*

Plaintiff also alleges that the conduct of the Troopers violated Gladys Kennery's rights under the Fourteenth Amendment of the Constitution. Summary judgment must be entered on this count as well.

In the context of a claim for damages arising from a tortuous infringement of civil rights, a state actor only violates the Fourteenth Amendment where the challenged conduct is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Pena v. Deprisco*, 432 F.3d 98, 122 (2d Cir. 2005). This standard is more stringent than gross negligence, which this Court has already determined was not met by the evidence in support of Plaintiff's pleadings. Thus, from the outset, Plaintiff has failed to meet this first prong necessary to sustain its civil rights violation claim. Indeed, the *Kane-Sabia* analysis, which dictates the absence of any duty on these facts arising under common law, affords a close-fitting template foreshadowing a similar fate for Plaintiff's claim of a civil rights violation.

The acts which "shock the conscience" must take the form of affirmative behavior, since a defendant's passive conduct will not support a constitutional claim. *Id*. at 109-10. A police officer's promise to act is not a sufficiently affirmative act. See *Bright v. Westmoreland County*,

---

[4] Even assuming a duty, the evidence could not support gross negligence as a matter of law. Gross negligence is a "heedless and palpable violation of legal duty respecting the rights of others" that is "substantially and appreciably higher in magnitude and more culpable than ordinary negligence." *Shaw, Adm'r v. Moore*, 104 Vt. 529, 531(1932); *Hardingham v. United Counseling Service of Bennington County, Inc.,* 164 Vt. 478, 481 (1995). While the Troopers either misunderstood the directions to Gladys' home, or failed to follow them accurately, their efforts at trying to locate Gladys went well beyond acts that could be accurately described as "heedless. Again, compare *Kane*, 2007 VT 91, ¶ 12 (as a matter of law, good faith errors in judgment do not evince gross negligence).

443 F.3d 276, 284 (3d Cir. 2006) (officer's misrepresentation that he would arrest a person who would go on to subsequently murder plaintiff's daughter did not violate plaintiff's constitutional rights as police did not actually restrain plaintiff's ability to protect his family); *Pinter v. Johnson*, 54 F.3d 1169, 1175-76 (4th Cir. 1995) (en banc) (officer's misrepresentation that he would jail plaintiff's subsequent assailant was not a constitutional violation as officer did not impose any limitation of plaintiff's ability to defend herself). Far more obviously than in the authorities just cited, Defendants' failure to locate Gladys was not an affirmative deprivation of her autonomy.

Furthermore, the challenged conduct must put the victim in a worse position than the victim was in before the defendant's affirmative act. Such an affirmatively-created danger was recognized in *Kniepp v. Tedder*, where police officers gave the impression that they would render assistance to an intoxicated woman, but instead, left the woman alone to find her way home after separating her from her husband who was unable to help her. 95 F.3d 1199, 1209 (3d Cir. 1996). Here, on the other hand, having been unable to locate her, the Troopers did not affirmatively alter the status or position of Gladys in any way which enhanced her exposure to danger.

Similarly, it cannot reasonably be said that the Troopers were made aware of a grave danger and then willfully disregarded that risk. Unlike *Kniepp*, the Troopers were made aware only of the *possibility* of Gladys' peril. Notably, Plaintiff points to no Vermont cases informing the Court's assessment of the Plaintiff's claim based on the Fourteenth Amendment. Thus, holding that the authorities just discussed make the claim untenable, the Court grants Defendants' motion for summary judgment.[5]

## ORDER

**WHEREFORE** it is hereby **ORDERED**: Defendants' Motion for Summary Judgment is **GRANTED**.

Dated at Newfane, Vermont this   26th   day of October, 2010.

_____
Hon. John P. Wesley
Presiding Judge

---

[5] Given its ruling that no cause of action for a Fourteenth Amendment civil rights violations can be sustained against Defendants, the Court need not address Defendants' qualified immunity affirmative defense.